RACING ASSOCIATION OF CENTRAL IOWA, Iowa Greyhound Association, Dubuque Racing Association, Ltd., and Iowa West Racing Association, Appellants,

v.

Michael FITZGERALD, Treasurer, State of Iowa, Appellee.

No. 01–0011.

Supreme Court of Iowa.

June 12, 2002.

Rehearing Denied Aug. 6, 2002.

As Amended Sept. 6, 2002.

Mark McCormick, Thomas L. Flynn, and Edward M. Mansfield of Belin, Lamson, McCormick, Zumbach and Flynn, P.C., Des Moines, for appellant Racing Association of Central Iowa.

Gerald Crawford and Brad Schroeder of the Crawford Law Firm, Des Moines, for appellant Iowa Greyhound Association.

Stephen C. Krumpe of O'Connor & Thomas, P.C., Dubuque, for appellant Dubuque Racing Association, Inc.

Lawrence P. McLellan of Sullivan & Ward, P.C., Des Moines, for appellant Iowa West Racing Association.

Thomas J. Miller, Attorney General, and Jeffrey D. Farrell and Jean M. Davis, Assistant Attorneys General, for appellee.

STREIT, Justice.

Iowa racetracks challenge legislation that significantly increased the tax on racetracks, but not on riverboats. The district court upheld the unequal taxing scheme finding the state has a legitimate interest in promoting the riverboat industry and the economy of river towns. Because we find no rational basis exists for this differential tax treatment, we affirm in part, reverse in part, and remand.

## I. Background and Facts

The Racing Association of Central Iowa operates Prairie Meadows Racetrack and Casino in Altoona, Iowa. Dubuque Racing Association and Iowa West Racing Association operate racetracks in Dubuque and Council Bluffs, Iowa, respectively. Iowa Greyhound Association is an organization of greyhound owners that races at Dubuque Greyhound Park in Dubuque and at Bluffs Run in Council Bluffs.[1] The Racetracks sued the Treasurer of the State of Iowa (the "State"), asserting the wagering tax rate on racetracks is a violation of their equal protection rights under both the Federal Constitution and the Iowa Constitution.

Iowa authorizes two types of gambling establishments. Appellants are members of the first class of establishment—the racetrack—and are authorized by statute to conduct two types of gambling. They may engage in wagering on dog or horse races pursuant to Iowa Code section 99D.11 (1999). Racetracks accept wagers on live races at the track or on simultaneous telecast races approved by the Iowa Racing and Gaming Commission. Racetracks may operate slot machines, but they may not operate other games of chance or video machines. Iowa Code § 99F.1(9).

The second type of gambling establishment is excursion gambling boats ("riverboats"). Riverboats may not offer wagering on dog or horse races, but may offer a larger variety of other gambling games,

---

1. All of the plaintiffs shall be referred to hereinafter as the "Racetracks."

including table games, video machines, and slots. *Id.*

The issue in this case centers around the differential tax rate based on gross receipts generated at racetracks and riverboats. In 1994, the Iowa legislature enacted legislation designed to alleviate the stress put on the Iowa riverboat and racetrack industries, as both were losing significant revenue. This legislation permitted racetracks to operate slot machines and eliminated the wager and loss limits to assist in increasing revenue. Iowa Code §§ 99F.4A, 99F.2. Finally, the legislature adopted a higher wagering tax rate on racetracks. Iowa Code § 99F.11(1).

> The riverboats are taxed at the rate of five percent on the first one million dollars of adjusted gross receipts, at the rate of ten percent on the next two million dollars of adjusted gross receipts, and at the rate of twenty percent on any amount of adjusted gross receipts over three million dollars.

*Id.* § 99F.11. The tax rate for racetracks is considerably higher than for riverboats.[2] Beginning on January 1, 1997, the legislature set a rate of twenty-two percent on adjusted gross receipts over three million dollars from gambling games at racetracks. *Id.* This rate was set to increase by two percent each calendar year until the rate reaches thirty-six percent. *Id.* Racetracks are currently being taxed at thirty-two percent.

The Racetracks filed a petition in equity challenging the constitutionality of the differential tax imposed on racetracks. Specifically, they argue the taxing statute violates the equal protection clauses of the state the federal constitutions. The State filed a motion for summary judgment and the Racetracks filed a cross-motion for summary judgment. The district court denied the Racetracks' cross-motion for summary judgment concluding they failed to negate every conceivable basis for upholding the taxing statute. Because the court found a rational basis upon which to uphold the constitutionality of the statute, it granted this part of the State's motion for summary judgment. However, it denied the State's motion asserting the court did not have authority to grant injunctive relief because it is not vested with power to determine the appropriate tax rate. The Racetracks appeal.

## II. Scope of Review

We review the grant or denial of a motion for summary judgment for correction of errors at law. *Grovijohn v. Virjon, Inc.*, 643 N.W.2d 200, 202 (Iowa 2002) (citations omitted). Summary judgment is appropriate "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Iowa R. Civ. P. 1.981(3) (2002). The party moving for summary judgment must show no genuine issues of material fact exist. *Wright v. Am. Cyanamid Co.*, 599 N.W.2d 668, 670 (Iowa 1999). We will view the record in the light most favorable to the non-moving party. *Kelly v. Iowa Mut. Ins. Co.*, 620 N.W.2d 637, 641 (Iowa 2000).

## III. The Merits

■ The Racetracks argue the trial court erred in holding the tax statute was constitutional. They argue the justifications given by the State and the district court in support of the statute do not

---

2. A state representative from a riverboat county offered the original proposed amendment, H–5391 which proposed a forty percent gross-receipts tax on gambling games at racetracks. There was no stated reason for imposing the higher tax rate on racetracks.

satisfy the rational basis test. The State responds arguing racetracks and riverboats are dissimilar classes of activities which may be treated differently. However, if we find they are members of the same class, the State contends there is a legitimate state interest in treating racetracks differently than riverboats. In any event, the State argues the court is without authority to set the tax rate so it may not grant injunctive relief. We address each of these arguments in turn.

### A. Constitutionality of the Tax Statute

The Racetracks argue the thirty-six percent tax imposed in Iowa Code section 99F.11 is unique, discriminatory, and confiscatory. In so arguing, the Racetracks cite the Equal Protection Clauses of both the federal and state constitutions. Before we begin our analysis of this issue, we briefly address the significance of invoking both the state and federal constitutions.

The federal Equal Protection Clause prohibits states from "deny[ing] ... any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. The state Equal Protection Clause prohibits laws that "grant to any citizen, or class of citizens, privileges or immunities, which upon the same terms shall not equally belong to all citizens." Iowa Const. art. I, § 6. We have said Iowa courts are to "apply the same analysis in considering the state equal protection claims as ... in considering the federal equal protection claim." *In re Morrow,* 616 N.W.2d 544, 547 (Iowa 2000) (quoting *State v. Ceaser,* 585 N.W.2d 192, 196 (Iowa 1998)). With this principle in mind, we turn to the Racetracks' equal protection argument.

We begin our discussion with the presumption Iowa Code section 99F.11 is constitutional. *State v. Keene,* 629 N.W.2d 360, 364 (Iowa 2001). The Racetracks have a heavy burden of proving beyond a reasonable doubt the statute is unconstitutional. *Id.* Specifically to overcome the presumption of legislative constitutionality, they must negate every reasonable basis upon which to uphold the statute. *Id.* We have said before the legislature acts with broad authority in the realm of taxation. *Hearst Corp. v. Iowa Dep't of Revenue & Fin.,* 461 N.W.2d 295, 305 (Iowa 1990). Despite this broad authority, rational basis review of a taxing scheme is not tantamount to no judicial review. Even in the area of taxation, the legislature must not act in a wholly arbitrary manner in classifying persons or otherwise engage in invidious discrimination. *Great Atl. & Pac. Tea Co. v. Valentine,* 12 F.Supp. 760, 765 (S.D.Iowa 1935); *Fed. Land Bank of Omaha v. Arnold,* 426 N.W.2d 153, 156 (Iowa 1988).

### 1. Are Racetracks and Riverboats Similarly Situated?

The first step in our constitutional analysis is to determine whether racetracks and riverboats are similarly situated plaintiffs singled out for differential treatment. The State suggests racetracks and riverboats are not within the same class of activities for purposes of equal protection. We disagree. While it is true some differences exist between the two gaming facilities, a " 'mere difference is not enough.' It must be relevant or pertinent as well as rational." *Deadwood, Inc. v. North Carolina Dep't of Revenue,* 557 S.E.2d 596, 599 (N.C.Ct.App.2001) (citation omitted). Here, the State does nothing more than cite to mere differences. *See, e.g., Bierkamp v. Rogers,* 293 N.W.2d 577, 585 (Iowa 1980) (where passengers of automobiles were treated differently than passengers in other conveyances, the court found a violation of equal protection); *Gleason v. City of Davenport,* 275 N.W.2d 431, 435 (Iowa 1979) (though not the same, the

court found an equal protection violation where charter cities were treated differently than other cities because no "special or unique needs" of charter cities justified the differential treatment). We find none of the differences sufficiently compelling to find racetracks and riverboats are not of the same class.

The State contends riverboats and racetracks are different classes simply because one is land-based whereas the other floats on water. At first blush, this is an appealing argument. However, in reality the essence of the differential treatment is not rooted in the dissimilar scenery surrounding the main activity at both facilities. Rather, the heart of the tax statute is in its disparate treatment of the main activity taking place at both riverboats and racetracks. That is, the essence of the tax is that it treats racetrack slot machines differently than riverboat slot machines. Where the same activity is being taxed at significantly different rates, a mere difference in location is not sufficient to uphold the discriminatory tax.

Both facilities exist for the purpose of operating gambling games. The bulk of both entities' revenue is from slot machines. For example, from July 1, 1998 through June 30, 1999, Prairie Meadows' adjusted gross revenue and its slot revenue were identical because the horse tracks have no net revenue. During this same time period, the Miss Marquette riverboat had adjusted gross income of over $32 million, almost $27 million of which came from slot revenue.[3] If the bulk of their revenue was not based on slot machines, but rather we were called upon to determine whether horse revenue is different from gambling table revenue, our conclusion may be different. However, because most of the entities' revenue is derived from the same source, it is of little consequence that there are other different types of gambling games available at racetracks and riverboats. More importantly, both facilities are authorized to operate within the same gaming industry. Both operate slot machines that are the primary revenue-making vehicle for both facilities. Racetracks and riverboats serve gambling games to the same group of consumers. Both gaming facilities are equally important to the State in terms of revenue production. We conclude racetracks and riverboats are of the same class for purposes of this equal protection challenge. If the taxing statute treats them differently and there is no rational basis for such differential treatment, the statute violates equal protection.

## 2. Does the Statute Have a Rational Basis?

 Having concluded racetracks and riverboats are similarly situated, we must determine whether the differential tax is rationally related to a legitimate government interest. Equal protection requires the same treatment for similarly situated

3. From July 1, 1998 through June 30, 1999, Bluffs Run's adjusted gross revenue was over $110 million, $109 million of which came from slot revenue; and Dubuque had the same in adjusted gross revenue as it did from slot revenue. In total, all of the Iowa racetracks combined had over $281 million adjusted gross revenue, over $280 million of which came from slot revenue. In comparison, during the same fiscal year, Diamond Jo had over $44 million in adjusted gross revenue, over $36 million of which came from slot revenue; Mississippi Belle II had over $27 million adjusted gross revenue, over $25 million of which came from slot revenue; Catfish Bend had over $28 million adjusted gross revenue, over $23 million of which came from slot revenue; and Belle of Sioux City had over $25 million adjusted gross revenue, almost $19 million of which came from slot revenue. The riverboats had a total of over $513 million adjusted gross revenue, over $418 million of which came from slot revenue.

individuals. *Bowers*, 638 N.W.2d at 689. " 'If people are not similarly situated, their dissimilar treatment does not violate equal protection.' " *Id.* (quoting *In re Morrow*, 616 N.W.2d at 548). Because the classification of persons in this case involves neither a suspect class, nor a fundamental right, we need only find the legislature had a rational basis. *Id.* In reviewing an equal protection challenge, we first examine "the legitimacy of the end to be achieved; we then scrutinize the means used to achieve that end." *Arnold*, 426 N.W.2d at 156. To satisfy the rational basis standard, the classification of persons must be reasonable and operate equally upon all within the class. *Id.* The Racetracks can overcome the presumption of constitutionality only by showing the statute is patently arbitrary and bears no rational relationship to a legitimate governmental interest. *Bowers*, 638 N.W.2d at 689.

Overriding this entire issue is the fact that the 1994 legislation was designed to save the racetracks and riverboats from financial distress. The racing industry in Iowa initially saw some success. However, as time passed, the racetracks quickly began to lose significant revenue.[4] Likewise, the riverboats' initial success was soon followed by financial problems stemming from competition from other states. The primary reason the legislature authorized racetracks to operate slots was to provide them with increased revenue. Without revenue from the slot machines, the Racetracks' future was in question.

■ In determining whether the tax statute is constitutional, we must consider whether the asserted purpose behind this tax could have been the genuine goal of the legislation. *See Nordlinger v. Hahn*, 505 U.S. 1, 15–16, 112 S.Ct. 2326, 2334–35, 120 L.Ed.2d 1, 15–16 (1992). The very same legislation designed to help the racetracks recover from economic distress also increased the tax on racetrack slots at a rate eighty percent higher than the tax imposed on riverboat slots. Though the State contends the stated purpose behind the racetracks is to encourage economic development and promote agriculture, this differential tax is contrary to such alleged intent. Moreover, any stated benefit from the 1994 legislation is substantially jeopardized by the new tax rate imposed on the racetracks. We "need not in equal protection cases accept at face value assertions of legislative purposes, when ... the asserted purpose could not have been a goal of the legislation." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n. 16, 95 S.Ct. 1225, 1233 n. 16, 43 L.Ed.2d 514, 525 n. 16 (1975). We now turn to the effect the differential taxing scheme has on both racetracks and riverboats.

Overall, the differential tax treats racetrack slot machines significantly differently than riverboat slot machines despite the fact slots make up the substantial portion of both gaming facilities' revenue. The direct result of the tax is that Racetracks must pay drastically more additional tax than riverboats are required to pay. As the tax rate increases, each of the racetracks has been and will continue to be forced to pay increasingly significant additional tax on gross receipts. For example, if Prairie Meadows' revenue remains the same as it was in 1999, it will pay almost

---

4. For instance, in 1989 the Waterloo racetrack realized a profit of almost $29 million dollars. However, by 1993, the revenue at this racetrack steeply declined to nearly $13 million. The racetracks at Council Bluffs and Dubuque saw similar fates. Council Bluffs started with an annual revenue of over $105 million but showed an annual revenue in 1993 of little more than $42 million. In 1989, Dubuque's racetrack made over $65 million, but the annual revenue figures in 1993 were just over $7 million. Finally, the racetrack in Altoona began with almost $38 million in revenue, but by the end of 1993 realized only $5 million.

$44 million dollars more in taxes for the years 2000–2002 than it would if it were a riverboat. The Dubuque Racing Association will pay an extra $9 million in taxes and the Iowa West Racing Association is expected to pay an additional $36 million dollars in taxes for these tax years. It is undisputed that because both racetracks and riverboats conduct gambling games, the two facilities are in direct competition. As a result of the differential tax rate, riverboats have a competitive advantage over racetracks.

Because the differential taxing scheme forces racetracks to pay eighty percent more taxes than they would as riverboats, the tax frustrates the racetracks' responsibility to distribute money to local government and charitable organizations. The racetracks are statutorily required to distribute profits "for educational, civic, public, charitable, patriotic, or religious uses." Iowa Code § 99F.6(4)(a). The thirty-six percent tax rate makes it difficult, if not impossible, for the racetracks to continue to make such societal contributions. When the gaming tax reaches thirty-six percent in 2003, many of the racetracks will have little, if any, profit. Without these grants and charitable gifts, many Iowa communities and charitable organizations will suffer.

Similarly, this taxing scheme frustrates the racetracks' ability to contribute to the overall economy of this state. The racetrack industry is responsible for employing hundreds of Iowans. It also supports the horse industry by distributing millions of dollars to purse supplements. The differential tax takes away the money racetracks need to accomplish these legislatively mandated goals. Overall, the effect of the tax is contrary to the legislative purpose of promoting agriculture and economic development.

A comparable situation is found in the dog-racing industry. The legislature stated the pari-mutuel dog racing industry is designed for "the development and promotion of Iowa greyhound racing dogs in this state." *Id.* § 99F.6(4)(b). The viability of pari-mutuel dog racetracks is completely dependent on slot revenue. A certain percentage of the dog tracks' adjusted gross receipts must be used to supplement purses of live dog races. *Id.* § 99D.12. Given these facts the differential tax scheme frustrates the alleged purposes behind allowing racetracks to operate. Though allegedly the legislation including the differential tax was designed to help the racetracks, eventually the thirty-six percent tax on gross receipts will seriously jeopardize the racetracks' viability.

Given the above facts, the inescapable conclusion is the differential tax is not rationally related to the main purpose of the legislation or to the intent behind authorizing racetracks to operate in this state. The stated purpose was allegedly to save the racetracks from economic distress. There can be no rational reason for this differential tax, unless the reason for it was to drive the racetracks out of business, thereby helping the riverboat industry. Unless we recognize the desire to discriminately tax one business for the purpose of supporting another similarly situated business as a legitimate government interest, we can find no other basis for upholding this law. When the stated purpose is not true or somehow misleading, we cannot find it was the real reason behind the legislation. If the offered purpose is not the genuine reason supporting the law, it likewise cannot be characterized as a rational reason. In the case before us, because the stated purpose of the legislation is frustrated by the legislation itself, it is impossible to conclude the legislature actually had its alleged purpose in mind when enacting this taxing statute.

■ The State appears to suggest a reason for the tax is the pure fact that the

market will allow it—that the racetracks can bear a higher tax than the riverboats. Even if this is true, it is not a rational basis for upholding the discriminatory tax. Though revenue production may be a legitimate state interest, this goal is not rationally served by a taxing scheme that discriminates against certain slot machines simply because of their geography. "[A] revenue measure based on gross receipts must apply equally to all for the privilege of doing the same act." *Finlayson v. Conner*, 167 So.2d 569, 572 (Fla.1964); *see also Tweel v. West Virginia Racing Comm'n*, 138 W.Va. 531, 76 S.E.2d 874, 879 (W.Va. 1953) (statute must apply equally to those of the same class and each member of the class permitted to engage in such business must be treated substantially alike). If the legislature wants to increase state revenue, then it must tax racetracks and riverboats equally at a rate they both can bear.

The State made other contentions not accepted by the trial court. We likewise find them unconvincing. None of the other justifications offered by the State in an effort to support the constitutionality of this tax scheme are rationally related to a legitimate state interest. Each justification ignores the plain fact that this differential tax completely defeats the alleged purpose of the 1994 legislation. The thirty-six percent tax rate does nothing to further the economic viability of the racetracks. Moreover, we are not persuaded that our state riverboat history can only be promoted through such favoritism as taxing racetracks at an eighty percent higher rate than riverboats. The State can make riverboats more competitive with other states without penalizing racetracks through a thirty-six percent tax on gross receipts. At a minimum, the tax frustrates the legislative purpose in permitting racetracks to operate. The legislation goes even further, however, by disabling an industry it was allegedly designed to aid.

 In sum, no legitimate reason has ever been offered for the differential tax rate. We can find no rational connection between the discriminatory tax and the alleged intent of promoting riverboat history. The reason for the tax is not that racetracks and riverboats are different. It is not that the two entities operate slightly different types of gambling games. We cannot justify this tax based on the fact racetracks operate on land whereas riverboats operate on water. And the tax is not designed to force the racetracks to make up for past tax breaks. Rather, it appears the purpose behind this discriminatory legislation was simply to allow the state to collect increased revenue from racetrack slots despite the fact they, like the riverboats, derive most of their revenue from slot machines. Where an additional tax based on gross receipts is imposed on only one member of the same class, purely for tax revenue purposes, the tax violates the federal and state equal protection clauses. *See Volusia County Kennel Club v. Haggard*, 73 So.2d 884, 890 (Fla.1954). We conclude the tax rate imposed upon the Racetracks is unconstitutional. We reverse and remand.

### B. Remedy for Constitutional Violation

 The State argues Iowa courts do not have the power to invalidate unconstitutional statutory schemes because this is strictly a legislative function. The district court found this argument to be "wholly without merit." Taken to its logical extreme, the State's argument means the legislature could pass any type of taxing scheme it desires, including unconstitutional ones, because it is immune from judicial review. This outcome is clearly not supported by case law as both state and federal courts have reviewed the constitutionali-

ty of particular taxing schemes. *See, e.g., South Cent. Bell Tel. Co. v. Alabama,* 526 U.S. 160, 119 S.Ct. 1180, 143 L.Ed.2d 258 (1999); *Hearst Corp.,* 461 N.W.2d at 295; *Atchison, Topeka & Sante Fe Ry. v. Bair,* 338 N.W.2d 338 (Iowa 1983). We conclude the district court correctly denied the State's motion for summary judgment on this issue. We affirm.

## IV. Conclusion

The fact remains that the Racetracks are burdened with a significant tax which the riverboats are not required to bear. We can find no rational reason for treating racetrack slot machines differently than riverboat slot machines. Because we are obligated to preserve as much of a statute as possible within constitutional restraints, we only declare unconstitutional that portion of the statute that imposes the discriminatory tax upon racetracks. *See Clark v. Miller,* 503 N.W.2d 422, 425 (Iowa 1993). The second sentence of the first paragraph of Iowa Code section 99F.11 shall be stricken and what remains is the same twenty percent tax on gross receipts over three million dollars for both racetracks and riverboats. Because we find the Racetracks satisfied their heavy burden to prove the tax scheme in Iowa Code section 99F.11 is not rationally related to a legitimate state interest, summary judgment should not have been granted. We therefore reverse. We also conclude the district court properly denied the State's motion for summary judgment based on the State's assertion the court does not have authority to grant relief in this case. We remand for determination of appropriate relief.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except NEUMAN, CARTER, and CADY, JJ., who dissent.

NEUMAN, Justice (dissenting).

I respectfully dissent. One slot machine may be the same as the next. But the legislature was looking at the bigger picture, and so must we.

Under the guise of entertainment and economic development, the State permits gaming corporations to lawfully part their customers from their money. Quite a lot of that money—thankfully—returns to the State in the form of tax receipts. The question is whether that taxing scheme, which differentiates between gaming on riverboats and gaming at racetracks, bears a rational relationship to a legitimate state interest. I think it does. At least the challengers here have not convinced me beyond a reasonable doubt that it does not.

Riverboats are not the same as racetracks. From an entertainment perspective, they speak to different cultural traditions—river lore versus agriculture. The majority questions these distinctions once gaming is attached to the enterprise. But there is no constitutional impediment to a legislature favoring diversity in cultural attractions for its citizens and tourists. And, rightly or wrongly, a legislative majority could rationally determine that a riverboat casino holds more romantic tourist appeal than a casino stuck in a dog track.

To advance these policy decisions, a reasonable legislature would also want to recognize a very pragmatic distinction between the two gambling venues: riverboats are mobile, racetracks are not. If the economic climate turns unfavorable here, a riverboat merely unties its lines and sails elsewhere. So it is not unreasonable for the legislature to create economic incentives to develop or retain riverboat gambling while maintaining the status quo with respect to other forms of the sport.

In short, there are a number of rational reasons why the legislature might tax land-based casinos differently from river-based ones. They are different enterprises. We might not agree with the legislature's rationale; we might think the tracks should enjoy a more competitive playing field or that gambling is a bad idea all the way around. But our views on the matter are irrelevant. Our concern is limited to finding a rational basis for the taxing scheme that passes constitutional muster. Because such a rational basis exists here, I would affirm the district court's rejection of the appellants' constitutional challenge.

CARTER and CADY, JJ., join this dissent.