PARK CORPORATION ET AL., APPELLEES, *v.* CITY
OF BROOK PARK ET AL., APPELLANTS.

[Cite as *Park Corp. v. Brook Park,*
102 Ohio St.3d 166, 2004-Ohio-2237.]

(No. 2002–1040—Submitted May 14, 2003—Decided May 19, 2004.)

PFEIFER, J.

### Factual and Procedural Background

{¶ 1} This case concerns the constitutionality of Brook Park Codified Ordinances ("BPCO") Chapter 709, which establishes an exhibition-center parking tax in the city of Brook Park. During the relevant time of this matter, the International Exposition Center ("I–X Center") was located in Brook Park and was the only exhibition center within that city. The I–X Center's parent company, Park Corporation, claims that the exhibition-center parking tax is unconstitutional.

{¶ 2} The I–X Center is a facility enclosing approximately 2.2 million square feet and is used for trade shows, exhibitions, and other events. It sits on approximately 189 acres of land immediately south of, and adjacent to, Cleveland Hopkins International Airport. The property includes parking lots with a 7,000–car capacity. Persons attending events at the I–X Center pay a fee to park in those lots.

{¶ 3} Four other businesses in Brook Park charge fees for parking. All provide parking for airport customers.

{¶ 4} On December 15, 1998, Brook Park enacted BPCO Chapters 708 and 709 aimed at taxing businesses that operate parking lots in the city. Chapter 708 imposes "upon every parking lot in the City of Brook Park that charges for parking or storage space for car rentals, a Transient Parking License Fee of $100 per year for every available parking or storage space rented for airport parking or other uses." BPCO 708.02(A). Section 2 of the ordinance provides: "The Transient Parking License Fee shall be paid by each company doing business in the City of Brook Park as airport parking and/or airport car rental." Section 6 of the ordinance specifically states that the ordinance does not apply to the I–X

Center, "as any fees related to parking at the I–X Center are covered by the Exhibition Center Parking License Fee Ordinance."

{¶ 5} The I–X Center was briefly subject to an ordinance that imposed a $100 per-space license tax. However, the city repealed that ordinance in response to Park Corporation's assertion that, based on the I–X Center's parking revenues, the per-space tax would exceed the maximum eight percent municipal parking tax rate allowable under R.C. 715.09. To address the unique I–X Center parking situation, the city enacted BPCO Chapter 709, which imposes "upon every Exhibition Center in the city of Brook Park that charges a parking fee an 8% tax. Such tax should be in the amount of 8% of the charge, fee or other consideration for any transaction." BPCO 709.02. However, to avoid too heavy a tax burden on the I–X Center, the city had planned to repeal its exhibition and promoters taxes.

{¶ 6} Pursuant to BPCO Chapter 709, the I–X Center Corporation was assessed, and paid under protest, $186,795.78 for calendar year 1999. Had the I–X Center been assessed under BPCO Chapter 708, it would have owed approximately $700,000 in taxes in 1999. The focus of Park Corporation's appeal, however, is the eight percent tax rate it paid. In comparison, the operators of the businesses involved in airport parking paid an effective tax rate of three percent.

{¶ 7} While BPCO Chapters 708 and 709 both relate to taxes paid for parking, there are distinctions between the two beyond the particular entities being taxed. The administration and collection of the respective taxes differ. Pursuant to BPCO 708.04, the airport parking tax is identified as a license fee and is administered by the city's Building Commissioner. City building department employees have counted the number of parking spaces available at the four businesses. The companies pay $100 per space per year in monthly installments. Those payments are made to the Building Commissioner.

{¶ 8} The tax imposed by BPCO Chapter 709, on the other hand, is administered by the city's Director of Taxation. BPCO 709.05. The tax is to be paid on a monthly basis and submitted with a remittance return, which must include the gross receipts that were collected from transactions for the calendar month and the total number of vehicles parked per month. BPCO 709.02(E). Recordkeeping requirements include a daily report showing the number of cars parked on an hourly, daily, weekly, or monthly basis for each event at the center, the gross receipts from all the transactions for each event, and the taxes due on all the transactions. BPCO 709.04.

{¶ 9} Besides administrative differences between the two taxing ordinances, the ordinances differ as to distribution of the tax proceeds. Both ordinances call for the revenues to be placed in the city's Economic Development Fund for the

following purposes: land purchases, roads and sewers, playground improvements, and any other economic development "designated by Council by Ordinance." BPCO Chapter 708, Section 5, and 709, Section 2. BPCO 709, Section 2 included another purpose for the revenues: "the promotion of the International Exhibition Center." Brook Park's mayor testified in deposition that such promotion ranges from brochures, to amenities packages for desired exhibitors, to providing grants to the I–X Center for help in attracting events.

{¶ 10} In January 1999, Park Corporation and the I–X Center filed a complaint against Brook Park and its Director of Taxation in the Cuyahoga County Common Pleas Court, alleging various deficiencies in Chapter 709. Park pursued claims that the ordinance violated the Equal Protection Clauses of the United States and Ohio Constitutions and imposed a nonuniform tax on real property or income in violation of the Ohio Constitution and state law.

{¶ 11} On February 14, 2001, the trial court ruled that Chapter 709 did not deny equal protection or violate Ohio's uniform income-tax requirement. In regard to equal protection, the trial court found that the distinction drawn between exhibition-center parking and other paid parking businesses in Brook Park derives from "a legitimate difference in the number of vehicles and people attending the exhibition center and the associated cost of necessary municipal services for the I–X Center, such as road construction and repair, traffic control, sanitation and police and fire protection."

{¶ 12} On May 9, 2002, the Eighth District Court of Appeals reversed the trial court. The appellate court held that Chapter 709 "violates equal protection constitutional standards" and is thus invalid. The appellate court found that any difference in the number of parking spaces at the I–X Center and the airport lots is not "significantly disparate to justify a heightened tax rate on I–X Center parking revenues." The court further found that the I–X center parking facilities did not burden city resources any more than the other lots. Although the court agreed with Brook Park "that the I–X Center as a whole and airport parking businesses merit different classifications" and, quoting the city's brief "to 'suggest that the operation of an exhibition center is similar to an airport parking operation is insulting to the Court,' " it concluded that there was no rational basis for Brook Park's different treatment of exhibition centers and other entities in the class it defined as "providers of fee-paid non-residential parking."

{¶ 13} Park Corporation relates that the I–X center was removed from Brook Park's municipal jurisdiction as a result of a land swap between Brook Park and the city of Cleveland. The I–X center now sits within the city limits of Cleveland. As a result, Chapter 709 has no further application to the I–X Center, and all that is at stake between the parties in this case is the three years of taxes paid by I–X

Corporation in 1999, 2000, and 2001. Park Corporation admits that the I–X center is now subject to Cleveland's eight percent parking tax.

{¶ 14} The cause is before this court upon the acceptance of a discretionary appeal.

## Law and Analysis

{¶ 15} R.C. 715.09 specifically allows a municipality to impose a tax of up to eight percent on the parking, storing, or housing of a motor vehicle:

{¶ 16} "A municipal corporation that imposes an excise or any other tax on the parking, housing, or storage of a motor vehicle in a lot, building, or other facility used for parking, housing, or otherwise storing motor vehicles shall not impose the tax at a rate greater than eight per cent of the fee or consideration charged for the parking, housing, or storage of the motor vehicle."

{¶ 17} Thus, the city of Brook Park was well within its delegated powers when it imposed the tax of eight percent on exhibition-center parking. The question is whether the failure to impose that same tax on airport parking lots made the exhibition-center parking tax violative of the Equal Protection Clause.

{¶ 18} The Fourteenth Amendment to the United States Constitution requires any state to afford "to any person within its jurisdiction the equal protection of the laws." Section 2, Article I of the Ohio Constitution provides "essentially identical" protection. *Kinney v. Kaiser Aluminum & Chem. Corp.* (1975), 41 Ohio St.2d 120, 123, 70 O.O.2d 206, 322 N.E.2d 880. The standard for determining whether a statute or ordinance violates equal protection is essentially the same under the state and federal Constitutions. *State v. Thompkins* (1996), 75 Ohio St.3d 558, 561, 664 N.E.2d 926.

{¶ 19} Cities and states are free to draw distinctions in how they treat certain citizens. "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn* (1992), 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1.

{¶ 20} In most cases, courts give a large degree of deference to legislatures when reviewing a statute on an equal protection basis. A classification warrants some kind of heightened review only when it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic; otherwise, "the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." Id.

{¶ 21} In a case like this one, where the law distinguishes for tax purposes among revenues obtained within a jurisdiction by two enterprises, each doing business in that jurisdiction, the law is subject to rational-basis review. *Fitzgerald v. Racing Assn. of Cent. Iowa* (2003), 539 U.S. 103, 107, 123 S.Ct. 2156, 156

L.Ed.2d 97. The United States Supreme Court has set forth the criteria for determining whether a classification rationally furthers a legitimate state interest:

{¶ 22} "[T]he Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." Id., quoting *Nordlinger*, 505 U.S. 1, 11–12, 112 S.Ct. 2326, 120 L.Ed.2d 1.

{¶ 23} This already deferential standard "is especially deferential" in the context of classifications arising out of complex taxation law. *Nordlinger*, 505 U.S. at 11, 112 S.Ct. 2326, 120 L.Ed.2d 1. " '[I]n structuring internal taxation schemes "the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation." ' " Id., quoting *Williams v. Vermont* (1985), 472 U.S. 14, 22, 105 S.Ct. 2465, 86 L.Ed.2d 11, quoting *Lehnhausen v. Lake Shore Auto Parts Co.* (1973), 410 U.S. 356, 359, 93 S.Ct. 1001, 35 L.Ed.2d 351. Thus, we must be especially deferential to the taxing decisions made by the Brook Park City Council.

{¶ 24} The within case is analogous to *Fitzgerald*. In *Fitzgerald*, the Iowa legislature instituted a statute that imposed a tax of up to 36 percent on income from slot machines at racetracks but a tax of only 20 percent on income from riverboat slot machines. In *Fitzgerald*, riverboats and racetracks, like the airport parking lots and I–X Center parking lots here, provided the same service at different types of locations.

{¶ 25} Racetrack owners challenged the statute on the basis of equal protection. The Iowa Supreme Court agreed with the plaintiffs, holding "that the 'differential tax completely defeats the alleged purpose' of the statute, namely, 'to help the racetracks recover from economic distress,' that there could 'be no rational reason for this differential tax,' and that the Equal Protection Clause consequently forbids its imposition." *Fitzgerald*, 539 U.S. 103, 106, 123 S.Ct. 2156, 156 L.Ed.2d 97, quoting *Racing Assn. of Cent. Iowa v. Fitzgerald* (Iowa 2002), 648 N.W.2d 555, 560–562.

{¶ 26} A unanimous United States Supreme Court reversed. The court reasoned that "the Iowa law, like most laws, might predominantly serve one general objective, say, helping the racetracks, while containing subsidiary provisions that seek to achieve other desirable (perhaps even contrary) ends as well, thereby producing a law that balances objectives but still serves the general objective when seen as a whole." Id., 539 U.S. at 108, 123 S.Ct. 2156, 156 L.Ed.2d 97.

{¶ 27} For instance, the Iowa statute did not just establish different tax rates—it also allowed slot machines at racetracks for the first time. The court stated, "Once one realizes that not every provision in a law must share a single objective, one has no difficulty in finding the necessary rational support for the 20 percent/36 percent differential here at issue." Id., 539 U.S. at 109, 123 S.Ct. 2156, 156 L.Ed.2d 97.

{¶ 28} The court found that there were several plausible reasons for classifying the slot machine revenues differently. The court wrote that the legislature may have intended to help the riverboats, which were also facing difficult financial times. The reduced tax rates may have been a way for the state to encourage its riverboats to stay in Iowa rather than to move elsewhere. The court also found that the reduced rate for riverboats may have operated to protect the reliance interests of riverboat operators, who had previously been taxed at the 20 percent rate. The court concluded that the facts did not preclude an inference that the different tax rates were to help the riverboats or river communities. Id.

{¶ 29} In this case, appellees argue that collecting revenue from parking facilities in different ways is contrary to the city's declared purpose of raising revenue for the city's Community Development Fund. To generate more revenue for that fund, the argument goes, all parking lots should have been taxed at one rate.

{¶ 30} However, the raising of revenue does not have to be the only objective of the legislation. As in *Fitzgerald,* a statute can meet its proclaimed purpose while at the same time balancing other objectives. BPCO Chapters 708 and 709 predominantly exist to create a revenue stream where none existed before. But a city may have additional objectives.

{¶ 31} One important objective for the city could have been the continued viability of the airport parking lots. Taxing the airport lots at a rate that disadvantaged them competitively could have worked against the city in its efforts to raise funds. Although the airport lots at issue are located in Brook Park, the airport is in Cleveland. Since the airport parking business involves shuttling parkers to the airport in Cleveland, the airport lots could be subject to taxation in Cleveland for that part of their service. At the time of the imposition of the airport parking tax, Brook Park understood that Cleveland was considering imposing a tax on businesses that deliver people to the airport. The possibility of an additional tax may have affected Brook Park's determination of the amount of the per-space tax.

{¶ 32} Further, in contrast to the exhibition-center parking tax, the airport parking tax provides the city a guaranteed payout with little administrative cost. That fact could have been another plausible reason for the classifications made by the city. The nature of the airport parking business made it suitable for an

annual, per-space licensing fee, which allowed the city to collect a steady, predictable stream of revenue without the bureaucracy required by an ordinance like BPCO Chapter 709.

{¶ 33} Finally, the city plausibly could have been seeking to aid the development of the part of the city that housed the airport lots.

{¶ 34} The competitive and operational differences between the two types of parking lots at issue give rise to plausible reasons for city council to have classified them differently. A legislative body stands in the best place to make decisions and calculations regarding the appropriate imposition and collection of taxes. Here, the Brook Park City Council had the power to decide where tax policy help was needed:

{¶ 35} "[T]he Constitution grants legislators, not courts, broad authority (within the bounds of rationality) to decide whom they wish to help with their tax laws and how much help those laws ought to provide. 'The "task of classifying persons for * * * benefits * * * inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line," and the fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.' " *Fitzgerald*, 539 U.S. at 108, 123 S.Ct. 2156, 156 L.Ed.2d 97, quoting *U.S.R.R. Retirement Bd. v. Fritz* (1980), 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368.

{¶ 36} This court's job is simply to determine, with a large degree of deference, whether there is a rational basis for the council's decisions. Applying the rational-basis test, we find that there are multiple plausible reasons for the classifications made by the city council here. The classifications are based on the very real differences between the two types of businesses involved, and the facts do not preclude an inference that the different taxing systems were intended to further the council's aims. Finally, the classifications here are not irrational or arbitrary, but instead take into account the special needs of different businesses. The Brook Park City Council's taxation decisions were measured and appropriate.

{¶ 37} Accordingly, we reverse the judgment of the court of appeals.

Judgment reversed.

MOYER, C.J., RESNICK, F.E. SWEENEY, HILDEBRANDT and LUNDBERG STRATTON, JJ., concur.

O'CONNOR, J., dissents.

LEE H. HILDEBRANDT JR., J., of the First Appellate District, sitting for COOK, J.

David A. Lambros, Brook Park Law Director, and Victoria L. Cardaman, Assistant Law Director; George J. Sadd, for appellant.

Jones Day, Steven E. Sigalow, Jason N. Mather and Brian A. Troyer, for appellees.