COLUMBIA GAS TRANSMISSION CORPORATION, APPELLEE AND CROSS-APPELLANT,
*v.* LEVIN, TAX COMMR., APPELLANT AND CROSS-APPELLEE.

[Cite as *Columbia Gas Transm. Corp. v. Levin,*
117 Ohio St.3d 122, 2008-Ohio-511.]

(No. 2006–1443—Submitted May 2, 2007—Decided February 14, 2008.)

CUPP, J.

{¶ 1} In this matter, the Tax Commissioner appeals from a decision of the Board of Tax Appeals ("BTA") that reversed the Tax Commissioner's determination that Columbia Gas Transmission Corporation ("Columbia") is an interstate-pipeline company as defined in R.C. 5727.01(D)(5) for the purpose of taxing the personal property of an Ohio public utility. The BTA held instead that Columbia satisfied the definition of a natural gas company in R.C. 5727.01(D)(4) and was thus entitled to have its personal property assessed at the 25 percent valuation rate for such companies in R.C. 5727.111(C), rather than the 88 percent rate for pipeline companies in R.C. 5727.111(D). After review, we have determined that the BTA's decision was unreasonable and unlawful, and therefore, in accordance with R.C. 5717.04, it is reversed. We further find that Columbia's cross-appeal is without merit, and it is overruled.

{¶ 2} In 2000, the General Assembly amended R.C. 5727.111 to reduce the assessment rate on the value of public-utility personal property of Ohio natural gas companies from 88 percent to 25 percent. The 25 percent rate became effective beginning with the 2001 tax year. See Am.Sub.S.B. No. 287, 148 Ohio Laws, Part V, 11536, 11549–11550.

{¶ 3} Columbia operates a natural gas pipeline that runs through a number of states. Columbia also maintains an underground system for storing natural gas. For the 2000 and 2001 tax years,[1] the Tax Commissioner assessed Columbia's personal property at the 88 percent rate for natural-gas-pipeline companies.

---

1. Columbia's statutory challenges pertain only to the 2001 tax year, while its constitutional challenges pertain to the 2000 and 2001 tax years.

{¶ 4} Columbia objected to having its taxable property assessed at the 88 percent rate. Columbia claimed that it is a natural gas company under R.C. 5727.01(D)(4), and it requested that the Tax Commissioner reassess its personal property at the 25 percent rate for natural gas companies in R.C. 5727.111(C).

{¶ 5} The Tax Commissioner found that Columbia was not a natural gas company under R.C. 5727.01(D)(4) because it does not supply or distribute natural gas directly to end-use consumers; rather, Columbia transports natural gas interstate through a network of pipelines. Specifically, the Tax Commissioner stated that Columbia's "transportation and storage services are for local gas distribution companies and industrial and commercial customers that contract for gas with producers or marketers. Therefore, [Columbia] is properly classified as a pipeline company under R.C. 5727.01(D)(5)."

{¶ 6} The Tax Commissioner also found that Columbia does not fit the profile of a typical natural gas company. Such companies usually operate in one state only, while pipeline companies tend to be interstate businesses. The Tax Commissioner further noted that the Public Utilities Commission of Ohio ("PUCO") regulates natural gas companies that operate in Ohio, and PUCO does not consider Columbia a natural gas company. Instead, the Federal Energy Regulatory Commission ("FERC") regulates interstate-pipeline companies, and Columbia is subject to regulation by FERC, not PUCO.

{¶ 7} Columbia appealed the Tax Commissioner's final determination to the BTA. The BTA reversed the Tax Commissioner, finding that Columbia satisfied the definition of "natural gas company" in R.C. 5727.01(D)(4). The BTA found that R.C. 5727.01(D)(4) was unambiguous and that Columbia satisfied the statutory definition by directly supplying "natural gas to industrial, power-generating, residential, and farm customers for the purposes (i.e., lighting, power, or heating) delineated in R.C. 5727.01(D)(4)." The BTA also determined that, while Columbia may satisfy the definition of a "pipe-line company" in R.C. 5727.01(D)(5), neither R.C. 5727.01(D)(4) nor (5) imposes a "primary business" test as an element in determining under which definition an entity should be classified for tax purposes. Accordingly, the BTA held that Columbia was entitled to have its property assessed at 25 percent.

{¶ 8} Columbia also argued that applying the pipeline assessment rate to its property violates the Equal Protection and Due Process Clauses of the United States and Ohio Constitutions and the Commerce and the Supremacy Clauses of the United States Constitution. The BTA recognized that it lacked jurisdiction to decide the merits of Columbia's constitutional challenges. See *Cleveland Gear Co. v. Limbach* (1988), 35 Ohio St.3d 229, 231, 520 N.E.2d 188.

{¶ 9} The Tax Commissioner appealed from the BTA's decision. Columbia filed a protective cross-appeal, again raising its constitutional arguments.

### Standard of Review

{¶ 10} In reviewing a decision of the BTA, we determine whether it is "reasonable and lawful." *Columbus City School Dist. Bd. of Edn. v. Zaino* (2001), 90 Ohio St.3d 496, 497, 739 N.E.2d 783. We "will not hesitate to reverse a BTA decision that is based on an incorrect legal conclusion." *Gahanna–Jefferson Local School Dist. Bd. of Edn. v. Zaino* (2001), 93 Ohio St.3d 231, 232, 754 N.E.2d 789. However, we will affirm the BTA's determinations of factual issues if the record contains reliable and probative evidence to support the BTA's findings. *Am. Natl. Can Co. v. Tracy* (1995), 72 Ohio St.3d 150, 152, 648 N.E.2d 483.

{¶ 11} The burden rests on the taxpayer "to show the manner and extent of the error in the Tax Commissioner's final determination." *Stds. Testing Laboratories, Inc. v. Zaino,* 100 Ohio St.3d 240, 2003-Ohio-5804, 797 N.E.2d 1278, ¶ 30. The Tax Commissioner's findings "are presumptively valid, absent a demonstration that those findings are clearly unreasonable or unlawful." *Nusseibeh v. Zaino,* 98 Ohio St.3d 292, 2003-Ohio-855, 784 N.E.2d 93, ¶ 10.

### The Tax Commissioner's Appeal

#### *Is a Primary-Business Test Applicable to R.C. 5727.01?*

{¶ 12} The Tax Commissioner contends that for determining the proper assessment rate to apply to public-utility property under R.C. 5727.111, an interstate-pipeline company that primarily transports natural gas through pipelines from production and wholesale sources to natural gas distribution systems is a "pipe-line company" as defined by R.C. 5727.01(D)(5), and not a "natural gas company" as defined by R.C. 5727.01(D)(4).

{¶ 13} For purposes of taxing a public utility, a person includes "a natural gas company when engaged in the business of supplying natural gas for lighting, power, or heating purposes to consumers within this state." See former R.C. 5727.01(D)(4).[2] According to R.C. 5727.01(D)(5), a person also includes "a pipe-line company when engaged in the business of transporting natural gas, oil, or coal or its derivatives through pipes or tubing, either wholly or partially within this state."

{¶ 14} The Tax Commissioner maintains that the BTA overlooked the dispositive statute on this issue: R.C. 5727.02. The Tax Commissioner argues that R.C. 5727.02(A) expressly establishes a primary-business test for purposes of defining

---

2. R.C. 5727.01(D)(4) was amended during the 2001 tax year to add the words "or distributing" after the word "supplying." The amendment also excluded from the definition of natural gas company "a person that is a governmental aggregator or retail natural gas supplier as defined in" R.C. 4929.01. All references to R.C. 5727.01(D)(4) are to the former version, which was controlling during the time period involved in this matter. Sub.H.B. No. 9, 149 Ohio Laws, Part II, 3857, 3895–3896.

"natural gas company" under R.C. 5727.01(D)(4). In contrast, Columbia argues that R.C. 5727.02 does not address how to distinguish between types of public utilities (e.g., between pipeline and natural gas companies). Rather, it establishes a test for determining whether an entity is a "public utility" at all.[3]

{¶ 15} The BTA found that "[n]either R.C. 5727.01(D)(4) nor (5) imposes a 'primary business' test as an element in determining under which definition an entity should be classified for tax purposes." The BTA mentioned R.C. 5727.02 in passing, indicating that the statute differentiated "between 'primary' and 'incidental' business activities of various public utilities referenced within R.C. Chapter 5727." Yet the BTA did not analyze or apply R.C. 5727.02 to this matter. We find that the BTA erred in failing to construe R.C. 5727.01 in pari materia with R.C. 5727.02.

{¶ 16} For the 2001 tax year, R.C. 5727.02 provided:

{¶ 17} "As used in this chapter, 'public utility,' 'electric company,' 'natural gas company,' 'pipe-line company,' 'water-works company,' 'water transportation company' or 'heating company' does not include any of the following:

{¶ 18} "(A) Any person that is engaged in some other primary business to which the supplying of electricity, heat, natural gas, water, water transportation, steam, or air to others is incidental." See Am.Sub.S.B. No. 3, 148 Ohio Laws, Part IV, 7962, 8080.

{¶ 19} The first rule of statutory construction is to look at the statute's language to determine its meaning. If the statute conveys a clear, unequivocal, and definite meaning, interpretation comes to an end, and the statute must be applied according to its terms. *Lancaster Colony Corp. v. Limbach* (1988), 37 Ohio St.3d 198, 199, 524 N.E.2d 1389. Courts may not delete words used or insert words not used. *Cline v. Ohio Bur. of Motor Vehicles* (1991), 61 Ohio St.3d 93, 97, 573 N.E.2d 77.

{¶ 20} We hold that R.C. 5727.02 establishes a primary-business test for determining whether an entity is a public utility for tax purposes and also for distinguishing between types of public utilities. "Public utility" is one of the entities to which the statute applies. But the statute also applies to an electric company, natural gas company, pipeline company, water-works company, water-transportation company, or heating company. R.C. 5727.02 separates these classifications by use of the word "or," which is defined "as a function word indicating an alternative between different or unlike things." *Pizza v. Sunset Fireworks Co., Inc.* (1986), 25 Ohio St.3d 1, 4–5, 25 OBR 1, 494 N.E.2d 1115. See also R.C. 1.42 ("Words and phrases shall be read in context and construed

---

3. Columbia incorrectly claims that this issue was not preserved for appeal; the Tax Commissioner raised this issue in his amended notice of appeal. See R.C. 5717.04.

according to the rules of grammar and common usage"). The General Assembly's use of the disjunctive "or," as opposed to the conjunctive "and," indicates that the classifications are intended to be read separately from each other, and public utility is only one of the classifications to which R.C. 5727.02 applies.

{¶ 21} Construed in pari materia with R.C. 5727.01, R.C. 5727.02(A) applies to those public utilities defined in R.C. 5727.01 as engaged in the business of supplying a particular commodity (e.g., electricity, heat, natural gas). Accordingly, R.C. 5727.02(A) would except a company from one or more of the public-utility classifications in its first paragraph if that company is engaged in some other primary business to which supplying a particular commodity is incidental. Indeed, the BTA has previously construed R.C. 5727.02 in the same manner. See *Cent. Trust Co. v. Lindley* (July 25, 1979), B.T.A. No. 78–C–244 (reading R.C. 5727.01 and 5727.02 in pari materia to find that company was not a "heating company" because it primarily engaged in another business and only incidentally supplied steam to others); *Chrysler Corp. v. Tracy* (Jan. 21, 1994), B.T.A. No. 91–K–1523, 1994 WL 19032, at *11, affirmed on other grounds (1995), 73 Ohio St.3d 26, 652 N.E.2d 185 (adopting the reasoning of *Cent. Trust* to find that company was not a natural gas company, because it was primarily engaged in marketing natural gas rather than supplying natural gas to consumers).

{¶ 22} Columbia counters that if it falls outside the definition of "natural gas company" because it engages in some other primary business to which supplying natural gas is incidental, then it also cannot qualify as a pipeline company, and therefore it is not a public utility. Columbia's argument is without merit for the following reasons.

{¶ 23} First, the General Assembly chose to distinguish between natural gas companies and pipeline companies by defining them differently in R.C. 5727.01(D)(4) and (5). Columbia could be classified as a pipeline company—and hence a public utility—and yet not be a natural gas company, because supplying natural gas is only incidental to its primary business of transporting natural gas.

{¶ 24} Second, pipeline companies are not included in the list of companies that are excepted by R.C. 5727.02(A). The first paragraph of R.C. 5727.02 lists those entities that can be excepted from the definitions set forth in R.C. 5727.01. R.C. 5727.02(A), however, applies only to those entities *supplying* electricity, heat, natural gas, water, water transportation, steam, or air to others. A pipeline company is any person "*transporting* natural gas, oil, or coal or its derivatives through pipes or tubing, either wholly or partially within this state." (Emphasis added.) R.C. 5727.01(D)(5). Because pipeline companies are those defined as "transporting" rather than "supplying" a commodity, division (A) of R.C. 5727.02 cannot act to except pipeline companies. In short, contrary to Columbia's argument, applying R.C. 5727.02(A) to this matter would not have the effect of

disqualifying it as a natural gas company, as a pipeline company, and as a public utility.

{¶ 25} Accordingly, as applied to this matter, R.C. 5727.02(A)(1) provides that a natural gas company does not include "any person that is engaged in some other primary business to which the supplying of * * * natural gas * * * to others is incidental." Thus, although Columbia·may fall within the definition of "natural gas company" in R.C. 5727.01(D)(4) by supplying natural gas for lighting, power, or heating purposes to consumers within this state, according to R.C. 5727.02(A), it may not be considered a natural gas company for the purpose of taxing a public utility if it is engaged in some other primary business to which supplying natural gas to others is incidental.

{¶ 26} *Columbia's Primary Business.* The evidence in this case shows that Columbia is primarily engaged in the business of transporting natural gas interstate through a network of pipelines in ten states. Columbia offers "a variety of services related to the movement of natural gas, specifically transportation," as well as services involving the underground storage of natural gas.

{¶ 27} Testimony before the BTA indicated that Columbia's primary customers are natural gas companies and natural gas marketers. Natural gas companies, generally termed local distribution companies ("LDCs"), are companies that distribute natural gas by receiving gas from a pipeline company's transmission system and delivering the gas to the end user.[4] Marketers use Columbia's pipeline capacity to provide bundled natural gas services for their customers.

{¶ 28} Columbia does not own any of the natural gas that it transports, nor does it own any distribution or supplying property. Further evidence revealed that Columbia's pipelines are not configured to provide a substantial delivery service to residential customers.

{¶ 29} Columbia does have "direct-connect customers," i.e., customers that receive gas directly from a Columbia transmission pipeline rather than from an LDC. Columbia's direct-connect customers include power companies, industrial customers, and farm-tap customers. In fact, Columbia has almost 32,000 farm-tap customers.

{¶ 30} However, according to Carl Levander, a vice president for Columbia's parent corporation, NiSource, these customers represent a "finite universe" of end-use customers who are located in close proximity to Columbia's pipelines. Moreover, the volume of gas transported to these direct-connect customers is a "relatively small percentage" and the revenue generated from these customers is "minimal compared to the total revenues" generated from Columbia's transmis-

---

4. LDCs located in Ohio satisfy the definition of "natural gas company." R.C. 4905.03(A)(6); see generally *Gen. Motors Corp. v. Tracy* (1997), 519 U.S. 278, 282, 117 S.Ct. 811, 136 L.Ed.2d 761.

sion business. Indeed, according to Columbia's Ohio Public Utility Gross Receipts Tax Reports for tax years 2000 and 2001, Columbia did not report any revenue from natural gas distribution; all receipts were from natural gas transmission.

{¶ 31} In sum, the vast majority of Columbia's pipeline business is the interstate transportation of natural gas. Any natural gas supplied to its direct-connect customers is incidental to Columbia's primary business as a pipeline company. Thus, pursuant to R.C. 5727.02(A), Columbia does not fall within the definition of a natural gas company in R.C. 5727.01(D)(4).

### Columbia's Contrary Arguments

{¶ 32} Columbia contends that an Ohio taxpayer that transports natural gas interstate by pipeline and delivers natural gas, directly and indirectly, to Ohio consumers satisfies the definition of a "natural gas company" in R.C. 5727.01(D)(4) and is entitled to be taxed as a natural gas company under R.C. 5727.111(C). Columbia maintains that delivering natural gas to even a small number of consumers, and especially to large-volume consumers such as its power and industrial customers, is adequate to put Columbia in the business of supplying and distributing natural gas.

{¶ 33} Columbia's primary argument to support this claim is that statutes imposing a tax are to be construed strictly against the state and liberally in favor of the taxpayer. According to Columbia, because it satisfies the definition of both a natural gas company under R.C. 5727.01(D)(4), and a pipe-line company under R.C. 5727.01(D)(5), the statutes must be construed to give Columbia the benefit of the more favorable category.

{¶ 34} Columbia is correct that a statute that imposes a tax requires strict construction against the state, with any doubt resolved in favor of the taxpayer. See *Gulf Oil Corp. v. Kosydar* (1975), 44 Ohio St.2d 208, 73 O.O.2d 507, 339 N.E.2d 820, paragraph one of the syllabus; *Lancaster Colony Corp.*, 37 Ohio St.3d at 199, 524 N.E.2d 1389; *Lakefront Lines, Inc. v. Tracy* (1996), 75 Ohio St.3d 627, 629, 665 N.E.2d 662. But rules of strict construction do not apply if the statutory language is plain and unambiguous, because such statutes are to be applied as written, not construed in any party's favor. See *Storer Communications v. Limbach* (1988), 37 Ohio St.3d 193, 194, 525 N.E.2d 466; *Lancaster Colony Corp.*, 37 Ohio St.3d at 199, 524 N.E.2d 1389. R.C. 5727.02(A) clearly excepts Columbia from the definition of natural gas company in R.C. 5727.01(D)(4) because Columbia's primary business is interstate natural gas transportation and not local distribution.

{¶ 35} Moreover, we have rejected the strict-construction doctrine when its application would result in unreasonable or absurd consequences. See *CC*

*Leasing Corp. v. Limbach* (1986), 23 Ohio St.3d 204, 207, 23 OBR 364, 492 N.E.2d 421. Indeed, it is the function of courts to construe statutory language to effect a just and reasonable result. *Gulf Oil Corp.*, 44 Ohio St.2d 208, 73 O.O.2d 507, 339 N.E.2d 820, paragraph two of the syllabus. See also R.C. 1.47(C) (in enacting a statute, it is presumed that a just and reasonable result is intended).

{¶ 36} It would be unreasonable to tax Columbia's entire property under the lower natural-gas-company rate when Columbia's pipeline and equipment are primarily used in transporting natural gas and not in supplying gas to end-user consumers. Columbia would have us tax its personal property based on a minor incidental use, rather than its major and primary use. But Columbia's interpretation of R.C. 5727.01(D)(4) and (5) would blur the distinction between natural gas companies and pipeline companies. Indeed, were we to accept Columbia's position, an interstate-pipeline company supplying natural gas to even *one* end-use consumer could be classified as an Ohio natural gas company for the purpose of taxing the personal property of a public utility.

{¶ 37} Columbia additionally claims that by delivering natural gas to LDCs for subsequent delivery to the end-use customers of the LDCs, Columbia is supplying natural gas to Ohio consumers. Yet one is a natural gas company only when "supplying natural gas *for lighting, power, or heating purposes to consumers* within this state." R.C. 5727.01(D)(4). When Columbia transports natural gas to LDCs, who then deliver the gas to end-use consumers, it is not "supplying" natural gas to the LDCs for the purposes contemplated by R.C. 5727.01(D)(4). See *Chrysler Corp. v. Tracy*, 73 Ohio St.3d 26, 652 N.E.2d 185. Under Columbia's interpretation, all pipeline companies would automatically qualify as Ohio natural gas companies simply by transporting gas to an LDC's distribution facility. That cannot be the construction intended by the General Assembly.

### Conclusion

{¶ 38} Based on the foregoing, we find that the BTA erred in failing to construe R.C. 5727.01 in pari materia with R.C. 5727.02. R.C. 5727.02(A) establishes a primary-business test for purposes of defining a natural gas company pursuant to R.C. 5727.01(D)(4). Because Columbia is primarily engaged in the business of a pipeline company, it is not a natural gas company for purposes of Ohio's personal property tax on public utilities. Accordingly, we reverse the decision of the BTA.

### Columbia Gas Transmission's Cross–Appeal

{¶ 39} Columbia has filed a protective cross-appeal contending that the assessment of its personal property at the 88 percent rate for pipeline companies is impermissible as a matter of constitutional law. We reject each of Columbia's constitutional challenges.

*Due Process*

{¶ 40} In proposition of law No. 2, Columbia maintains that under the Tax Commissioner's interpretation, R.C. 5727.01(D)(4) and (5) fail to adequately define tax classifications subject to different assessment rates and are void for vagueness on their face and as applied, in violation of due process protections in the Ohio and United States Constitutions.

{¶ 41} A court's power to invalidate a statute "is a power to be exercised only with great caution and in the clearest of cases." Laws are entitled to a "strong presumption of constitutionality," and the party challenging the constitutionality of a law "bears the burden of proving that the law is unconstitutional beyond a reasonable doubt." *Yajnik v. Akron Dept. of Health, Hous. Div.*, 101 Ohio St.3d 106, 2004-Ohio-357, 802 N.E.2d 632, ¶ 16; *Buckley v. Wilkins*, 105 Ohio St.3d 350, 2005-Ohio-2166, 826 N.E.2d 811, ¶ 18.

{¶ 42} "When a statute is challenged under the due-process doctrine prohibiting vagueness, the court must determine whether the enactment (1) provides sufficient notice of its proscriptions to facilitate compliance by persons of ordinary intelligence and (2) is specific enough to prevent official arbitrariness or discrimination in its enforcement." *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, ¶ 84, citing *Kolender v. Lawson* (1983), 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903. Moreover, laws directed to economic matters are subject to a less strict vagueness test than laws interfering with the exercise of constitutionally protected rights. *Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1982), 455 U.S. 489, 498–499, 102 S.Ct. 1186, 71 L.Ed.2d 362.

{¶ 43} *Facial Challenge.* A court examining a facial-vagueness challenge to a statute that implicates no constitutionally protected conduct will uphold that challenge only if the statute is impermissibly vague in all of its applications. *Hoffman Estates*, 455 U.S. at 494–495, 102 S.Ct. 1186, 71 L.Ed.2d 362. Yet Columbia makes no claim or showing that the statutes are invalid in all applications. Therefore, we reject Columbia's facial challenge.

{¶ 44} *As–Applied Challenge.* Columbia claims that when a company both transports natural gas and supplies it to consumers, the definitions of "natural gas company" and "pipeline company" provide no objective basis for classifying that company as one or the other. Thus, according to Columbia, the Tax Commissioner lacks legislative guidance and must simply decide for himself under which classification the company falls. In Columbia's view, the Tax Commissioner's "subjective" decision is "wholly unconstrained" and opens the door to arbitrary and discriminatory application.

{¶ 45} Columbia makes a blanket assertion that "[u]nder any meaningful vagueness standard, the statute here fails. * * * It attempts to draw a tax-determinative distinction between those companies that 'supply' natural gas and

those that 'transport' natural gas—a distinction that in today's natural gas market is 'substantially incomprehensible.' " Quoting *Buckley v. Wilkins*, 105 Ohio St.3d 350, 2005-Ohio-2166, 826 N.E.2d 811, ¶ 19.

{¶ 46} A civil statute that does not implicate the First Amendment is unconstitutionally vague only if it is so vague and indefinite that it sets forth no standard or rule or if it is substantially incomprehensible. Id.; *Hoffman Estates*, 455 U.S. at 495, 102 S.Ct. 1186, 71 L.Ed.2d 362, fn. 7. Moreover, the void-for-vagueness doctrine "does not require statutes to be drafted with scientific precision." *Perez v. Cleveland* (1997), 78 Ohio St.3d 376, 378, 678 N.E.2d 537.

{¶ 47} R.C. 5727.01(D)(4) and (5) set forth specific definitions that clearly distinguish between natural gas companies, which *supply* natural gas, and pipeline companies, which *transport* natural gas. These are well-understood industry terms that track the clear division between state and federal regulations of the natural gas industry. See Natural Gas Act of 1938, Section 717(b), Title 15, U.S.Code (defining FERC's jurisdiction over the interstate transportation of natural gas and exempting local distribution of gas from the Act); R.C. Chapter 4905 (PUCO has regulatory oversight over utilities that locally supply natural gas to end-user consumers in Ohio). Furthermore, R.C. 5727.02 establishes a primary-business test for distinguishing between the types of public utilities listed in R.C. Chapter 5727. Thus, the statutes provide standards for determining whether a company is classified as one or the other, and there is no basis for finding that the statutes encourage arbitrary and discriminatory enforcement on the part of the Tax Commissioner.

{¶ 48} Moreover, the availability of administrative remedies and appellate review acts to check any threat of arbitrary and discriminatory enforcement. See *Perez v. Cleveland*, 78 Ohio St.3d at 379, 678 N.E.2d 537, citing *United States ex rel. Fitzgerald v. Jordan* (C.A.7, 1984), 747 F.2d 1120, 1130. See also *Hoffman Estates*, 455 U.S. at 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (a "regulated enterprise may have the ability to clarify the meaning of [a] regulation by its own inquiry, or by resort to an administrative process"). The Tax Commissioner's initial assessment was based on Columbia's own Annual Ohio Public Utility Property Tax Natural Gas Pipeline Company Reports. Columbia was able to object to the Tax Commissioner's initial assessments by filing a petition for reassessment. Columbia was then able to appeal the Tax Commissioner's final determination to the BTA. Finally, Columbia had an appeal as of right to this court. Thus, contrary to Columbia's assertion, the Tax Commissioner's determination was not "wholly unconstrained."

{¶ 49} In sum, Columbia has not shown that the statutes invite subjective or discriminatory enforcement. See *Grayned v. Rockford* (1972), 408 U.S. 104, 113, 92 S.Ct. 2294, 33 L.Ed.2d 222. Because Columbia has not met its burden of

showing that the statutes here are unconstitutional beyond a reasonable doubt, we overrule its second proposition of law.

## Federal Commerce Clause

{¶ 50} Columbia contends in proposition of law No. 3 that where a federally regulated interstate-pipeline company competes in serving the same transportation and storage functions as state-regulated LDCs, the Commerce Clause forbids assessing the interstate pipeline's property at a higher rate than that of the competing LDCs.

{¶ 51} The Commerce Clause grants Congress the power "[t]o regulate Commerce * * * among the several States." Clause 3, Section 8, Article I, United States Constitution. The United States Supreme Court has recognized a negative or "dormant" Commerce Clause power that "prohibits state taxation, or regulation, that discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace.'" (Citations omitted.) *Gen. Motors Corp. v. Tracy* (1997), 519 U.S. 278, 287, 117 S.Ct. 811, 136 L.Ed.2d 761, quoting *Reeves, Inc. v. Stake* (1980), 447 U.S. 429, 437, 100 S.Ct. 2271, 65 L.Ed.2d 244.

{¶ 52} Under consideration in *Gen. Motors Corp. v. Tracy,* 73 Ohio St.3d at 30, 652 N.E.2d 188, was an Ohio statute that imposed a general sales tax on sales of natural gas in the state and a use tax on natural gas purchases out-of-state. Ohio's tax scheme exempted natural gas sales by entities that met the definition of "natural gas company" under R.C. 5727.01(D)(4). It was undisputed that natural gas utilities, or LDCs, located in Ohio satisfied the definition of "natural gas company." General Motors, a buyer of natural gas from an out-of-state marketer, challenged the exemption of LDCs from the sales and use tax imposed on sellers of natural gas. We found that non-LDC gas sellers, such as producers and independent marketers, were not natural gas companies under R.C. 5727.01(D)(4); therefore, their sales were outside the exemption and subject to the tax. Id., citing *Chrysler Corp. v. Tracy,* 73 Ohio St.3d 26, 652 N.E.2d 185 (both cases were issued the same day).

{¶ 53} The United States Supreme Court held that there was no Commerce Clause violation in *Gen. Motors Corp.* because the supposedly favored and disfavored entities were not similarly situated. 519 U.S. at 310, 117 S.Ct. 811, 136 L.Ed.2d 761. Specifically, the court found that the out-of-state marketers did not serve the LDCs' core market of small, captive end users of natural gas, including residential customers who wanted or needed bundled natural gas services and the protections afforded by utility regulation, and small-volume buyers who would not benefit economically from purchasing gas on the open market. Id. at 301–302, 117 S.Ct. 811, 136 L.Ed.2d 761. In short, the court premised its holding that Ohio's tax scheme was not facially discriminatory on the

view that LDCs and independent marketers were principally serving different markets.

{¶ 54} *Gen. Motors Corp.* recognized that before a finding of discrimination under the Commerce Clause could be made, different treatment must be accorded to substantially similar entities. The court found that where the allegedly competing entities provide different products, the threshold question is whether the companies are similarly situated for constitutional purposes. "This is so for the simple reason that the difference in products may mean that the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed. If in fact that should be the case, eliminating the tax or other regulatory differential would not serve the dormant Commerce Clause's fundamental objective of preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." Id. at 299, 117 S.Ct. 811, 136 L.Ed.2d 761. Therefore, we must first decide whether interstate-pipeline companies and LDCs are similarly situated.

{¶ 55} Columbia maintains that there are no relevant differences between interstate pipelines and LDCs that justify assessing interstate-pipeline companies at an 88 percent valuation rate and LDCs at 25 percent. See R.C. 5727.111(C) and (D). We disagree.

{¶ 56} As in *Gen. Motors Corp.,* the statutory scheme favors certain entities that satisfy the definition of a natural gas company in R.C. 5727.01(D)(4). Moreover, as in *Gen. Motors Corp.,* the allegedly favored and disfavored entities here principally serve different markets.

{¶ 57} The evidence in this case shows that interstate-pipeline companies do not compete with Ohio LDCs to service the residential and small commercial end-use natural gas consumer. Interstate-pipeline companies, like Columbia, primarily transport natural gas interstate from production areas to LDCs. The primary customers of interstate pipelines are not residential or small-volume end-use consumers, but LDCs and independent and LDC-affiliated natural gas marketers. Even after significant restructuring of the natural gas industry, the core market of Ohio LDCs remains retail sales and distribution of natural gas to residential and small commercial end-use consumers.

{¶ 58} "[I]n the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply. The dormant Commerce Clause protects markets and participants in markets, not taxpayers as such." *Gen. Motors Corp.,* 519 U.S. at 300, 117 S.Ct. 811, 136 L.Ed.2d 761. Because interstate-pipeline companies, like Columbia, and Ohio

LDCs do not compete in the same market, they are not "similarly situated" for Commerce Clause purposes. Thus, we reject this claim.

### Columbia's Contrary Commerce Clause Arguments

{¶ 59} Columbia contends that interstate pipelines and LDCs are "substantially similar" for Commerce Clause purposes. In Columbia's view, interstate pipelines and LDCs are part of the same natural gas distribution network, own the same sorts of property, and compete with one another in various ways.

{¶ 60} *LDC Transmission Property.* In Columbia's view, LDCs do more than merely engage in the local distribution of natural gas to end users; rather, Columbia maintains that the evidence shows that LDCs are also engaged in the "transmission" of natural gas in direct competition with interstate-pipeline companies.

{¶ 61} Columbia submitted evidence to the BTA in an attempt to show that Ohio LDCs own and operate significant amounts of transmission pipeline. Columbia relied heavily on reports filed with the United States Department of Transportation's Office of Pipeline Safety, which distinguishes between transmission and distribution based on the size and pressure strength of the pipeline.

{¶ 62} Columbia's evidence in this regard is not persuasive. For public-utility-tax purposes, the Tax Commissioner has adopted FERC definitions that distinguish between interstate transportation or transmission and local distribution of natural gas. See Natural Gas Act of 1938, Section 717(B), Title 15, U.S.Code. According to the FERC, pipeline diameter and pressure are not controlling for purposes of distinguishing between interstate transportation and local distribution. See *Midwestern Gas Transm. Co.* (May 12, 1999), FERC No. CP98–538–001, 1999 WL 298625, at *7. Rather, the FERC defines interstate transportation as beginning at the point where the interstate pipeline receives gas from the gathering or production area and ending at the point where the interstate pipeline delivers gas into the LDC's distribution facility (commonly known as the "city gate"). See Part 201(29)(B), Title 18, C.F.R. See also *Midwestern Gas Transm. Co.* (Dec. 16, 1998), FERC No. CP98–538–000, 1998 WL 878038, at *4 (local distribution—as opposed to interstate transportation—connotes a network of small local lines used to transmit gas from a large interstate pipeline to individual consumers spread out in a local geographic area).

{¶ 63} Furthermore, both FERC and federal courts have found that the transportation of natural gas by an interstate pipeline directly to an end user constitutes transportation in interstate commerce, not local distribution. See *Oklahoma Natural Gas Co. v. Fed. Energy Regulatory Comm.* (C.A.D.C.1990), 906 F.2d 708, 710; *Pub. Utils. Comm. of California v. Fed. Energy Regulatory Comm.* (C.A.D.C.1990), 900 F.2d 269, 277.

{¶ 64} Nevertheless, Columbia claims that the FERC-defined " 'distribution area' is a subjective concept, and is often treated as simply referring to a point where natural gas is transferred from an upstream pipeline company to a downstream LDC" and that "[e]ven under this location-driven definition, several Ohio LDCs identify a significant portion of their property as 'transmission' rather than 'distribution.' " However, Columbia's argument ignores the testimony of its own witnesses that the term "transmission" is also largely subjective and can have different meanings for purposes of utility ratemaking, safety, and taxation. In fact, in several instances, Columbia witnesses referred to LDC-owned "transmission" pipelines that FERC would have classified as "distribution" pipelines.

{¶ 65} Moreover, Columbia's witnesses had no specific knowledge whether this "transmission" property was actually used by LDCs to provide transportation or distribution services. Finally, other testimony indicated that, whether designated as transmission or distribution, LDC-owned pipelines were primarily used to distribute gas to end-use customers. In short, Columbia's evidence does not show that interstate-pipeline companies are competing with LDCs for the same transportation-service customers.

{¶ 66} *Direct Competition Between Interstate–Pipeline Companies and LDCs.* Columbia claims that interstate-pipeline companies compete directly with Ohio LDCs in (1) directly delivering gas to large industrial and electric power end users and farm-tap customers, (2) providing storage services, and (3) providing gathering or production services. However, as the Tax Commissioner points out, the existence of other areas of actual or potential competition does not alter *Gen. Motors Corp.*'s holding.

{¶ 67} In *Gen. Motors Corp.,* the court considered whether current or potential competition between marketers and LDCs in the noncaptive (nonresidential) market requires treating marketers and LDCs alike for dormant Commerce Clause purposes. That is, the court decided whether to "accord controlling significance to the noncaptive market in which they compete, or to the noncompetitive, captive market in which the local utilities alone operate." *Gen. Motors Corp.,* 519 U.S. at 303–304, 117 S.Ct. 811, 136 L.Ed.2d 761.

{¶ 68} The court found that "a number of reasons support a decision to give the greater weight to the captive market and the local utilities' singular role in serving it, and hence to treat marketers and LDCs as dissimilar for present purposes." Id. at 304, 117 S.Ct. 811, 136 L.Ed.2d 761. Significantly, the court recognized the importance of traditional regulated service to the captive market and an obligation to proceed cautiously so as not to jeopardize the LDCs' continuing capacity to serve that market. Id. The court further noted that states have an important stake in protecting the captive market and that state regulation of natural gas sales to local consumers serves important interests in

health and safety, including requiring a dependable supply and ensuring that residential customers are not frozen out of their houses in cold months. Id. at 306, 117 S.Ct. 811, 136 L.Ed.2d 761.

{¶ 69} Those interests are no less relevant to this matter than they were in *Gen. Motors Corp.* Ohio continues its regulation of natural gas rates and services to the benefit of residential and other small-volume users. See R.C. 4905.22 (requiring just and reasonable rates and adequate service and facilities) and R.C. 4905.14(B) (requiring each natural gas company to submit annual forecasts of future gas supply and demand). Ohio requires LDCs to serve all customers and ensure access to natural gas without discrimination. See R.C. 4905.02, 4905.03(A)(6), 4905.06, and 4905.35. See also R.C. 4929.02(A)(1) and (9) and 4929.03. Ohio also protects residential customers by requiring LDCs to follow certain administrative procedures before terminating service, and additional protections are afforded to ensure that Ohio LDCs provide continued service to low-income, elderly, and handicapped residential customers. R.C. 4933.12 and 4933.122; Ohio Adm.Code 4901:1–18. And Ohio LDCs are currently default providers, or providers of last resort, for customers who return to LDCs for natural gas when an alternative supplier fails to provide service. See R.C. 4929.20(C)(2); Ohio Adm.Code 4901:1–27–12(G), (H), and (J).

{¶ 70} Columbia maintains that since *Gen. Motors Corp.* was decided, LDCs have unbundled their product and now are able to sell transportation and storage services separately from natural gas, meaning that LDCs directly compete with interstate pipelines that provide the same services. However, Columbia ignores the evidence that LDCs are still primarily serving the same residential and small-business markets that they were serving at the time *Gen. Motors Corp.* was decided.

{¶ 71} To be sure, LDCs now offer both bundled and unbundled services and, as Columbia notes, they can sell natural gas, transportation service, and storage service separately. Nevertheless, the main competitors of LDCs in the residential and small-business markets are not interstate-pipeline companies. Rather, independent and LDC-affiliated marketers compete with LDCs for commodity sales in this market. Moreover, marketers largely rely on the LDCs' distribution network to deliver their natural gas to end-use customers. In other words, interstate-pipeline companies do not compete for residential and small-business customers for either natural gas sales or transportation services.

{¶ 72} Columbia also maintains that it competes with Ohio LDCs in the residential market in direct delivery of natural gas to farm-tap customers. However, the existence of these farm-tap customers does nothing to support Columbia's claim that it directly competes in the Ohio residential market.

{¶ 73} Farm-tap customers were described as rural customers who had been granted the right to tap into Columbia's interstate-transmission pipeline at the time of construction. These farm taps were often given in exchange for an easement through the customer's land at the time of construction. At best, these farm-tap customers represent a small, unique segment of the residential market. Columbia offered evidence showing that it served over 30,000 farm-tap customers. By way of comparison, Columbia's affiliated LDC, Columbia Gas of Ohio, distributes natural gas to approximately 1.3 million residential customers.

{¶ 74} *Columbia's Other Claims.* Columbia alternatively argues that *Gen. Motors Corp.* is distinguishable because (1) it involved a comparison between a regulated utility and a nonregulated marketer and (2) different taxes (sales and property) were involved. Neither claim has merit.

{¶ 75} First, the outcome in *Gen. Motors Corp.* did not turn on a comparison between regulated and unregulated entities. Rather, the court determined that LDCs and independent marketers were not "similarly situated" for dormant Commerce Clause purposes because they did not compete in the LDCs' core residential market, and eliminating any tax differential between the LDCs and marketers would not alter the competitive nature of this market. *Gen. Motors Corp.*, 519 U.S. at 297–303, 117 S.Ct. 811, 136 L.Ed.2d 761. Columbia has not shown in this case that it competes with LDCs in the residential market or that it would compete in this market should we rule in its favor.

{¶ 76} Moreover, the fact that Columbia is "heavily regulated" does not make it "similarly situated" to state-regulated LDCs for purposes of the Commerce Clause. Columbia is a federally regulated interstate-pipeline company. Congress and the courts have long treated federal and state regulation of the natural gas industry separately by exempting local distribution of natural gas from federal regulation. Indeed, the *Gen. Motors Corp.* court reaffirmed the continuing importance of the states' interest in regulating the local natural gas market, noting that even amidst recent regulatory changes intended to increase competition in the natural gas industry, Congress has done nothing to limit the states' traditional local regulation. See *Gen. Motors Corp.*, 519 U.S. at 288–297, 117 S.Ct. 811, 136 L.Ed.2d 761 (describing historical evolution of natural gas industry and Congress's recognition of states' vital role in regulating the local market).

{¶ 77} Second, *Gen. Motors Corp.* also did not turn on the nature of the tax involved. In fact, the court suggested that the nature of the challenged tax was largely irrelevant in light of Ohio's complicated public-utility-property-taxation scheme, which subjects public utilities and nonutilities alike to an array of different tax burdens. *Gen. Motors Corp.*, 519 U.S. at 307–308, 117 S.Ct. 811, 136 L.Ed.2d 761, fn. 16.

{¶ 78} In conclusion, Columbia's failure to show that it is in direct competition with Ohio LDCs in the residential market proves fatal to its dormant Commerce Clause claim. Therefore, Columbia's third proposition of law is overruled.

## Federal Supremacy Clause

{¶ 79} Columbia argues in proposition of law No. 4 that assessing the personal property of interstate-pipeline companies at a higher rate than that of LDCs and general businesses with which interstate-pipeline companies compete impairs and is inconsistent with federal regulatory authority and violates the Supremacy Clause of the United States Constitution.

{¶ 80} The Supremacy Clause of Article IV of the United States Constitution is the source of Congress's power to preempt state law. "Preemption may be express or implied, but in either case, the question is one of congressional intent." *Michigan Consol. Gas Co. v. Panhandle E. Pipe Line Co.* (C.A.6, 1989), 887 F.2d 1295, 1300, citing *California Fed. S. & L. Assn. v. Guerra* (1987), 479 U.S. 272, 281, 107 S.Ct. 683, 93 L.Ed.2d 613. In the absence of express statutory language, Congress may implicitly intend to occupy a given field to the exclusion of state law. Such intent may be properly inferred if (1) the pervasiveness of the federal regulation precludes supplementation by the states, (2) the federal interest in the field is sufficiently dominant, or (3) the object of the federal law and the obligations imposed by it reveal the same purpose. Finally, even if Congress has not entirely displaced state regulation in a particular field, federal law preempts state law when it actually conflicts with federal law. A conflict will be found if it is impossible to comply with both state and federal law, or if the state law is an obstacle to fulfilling the purposes and objectives of Congress. *Michigan Consol. Gas Co.*, 887 F.2d at 1300–1301, citing *Schneidewind v. ANR Pipeline Co.* (1988), 485 U.S. 293, 299–300, 108 S.Ct. 1145, 99 L.Ed.2d 316.

{¶ 81} Columbia raises three distinct claims that Ohio's different assessment rates are incompatible with FERC's pervasive regulation of wholesale sales and interstate transportation of natural gas. We address each in turn.

{¶ 82} First, Columbia argues that the different assessment rates conflict with FERC's ratemaking authority by interfering with the ability of federally regulated pipelines to pass along costs to their customers. Columbia complains that the discriminatory nature of Ohio's tax places interstate-pipeline companies at a competitive disadvantage that requires them to discount their FERC-approved rates.[5]

---

5. According to testimony, interstate pipelines may charge no more than their FERC-approved tariffed rates but may offer rates below their full tariffs.

{¶ 83} Columbia's argument assumes that interstate-pipeline companies and LDCs compete in the segment of the natural gas market under FERC's exclusive regulatory jurisdiction. See generally *Pub. Util. Comm. of California v. Fed. Energy Regulatory Comm.*, 900 F.2d at 274–276 (describing FERC's jurisdiction over interstate transportation of natural gas and the states' authority over local distribution). Yet the record here fails to show any direct or significant competition between interstate-pipeline companies and Ohio LDCs for the interstate transportation of natural gas, i.e., from gathering or production areas to local distribution areas. Moreover, the evidence indicated that discounting was a function of the market and that state taxes were only one of several factors that led interstate-pipeline companies to offer discounted rates. Thus, there is no merit to Columbia's claim that Ohio's higher assessment rate conflicts with FERC's ability to regulate the rates of interstate-pipeline companies.

{¶ 84} Second, Columbia maintains that Ohio's different assessments undermine FERC policies favoring free competition in the market of natural gas gathering. However, there is no evidence here that any interstate-pipeline companies owned or operated natural gas gathering or production facilities in Ohio during the tax years in question. Thus, it is difficult to see how Columbia— or any interstate-pipeline company—was disadvantaged by a lower assessment rate on gathering facilities owned by Ohio LDCs or general businesses.

{¶ 85} Third, Columbia contends that Ohio's tax structure interferes with recent FERC efforts to encourage interstate-pipeline direct connections to end users. According to Columbia, the different assessment rates directly interfere with Columbia's ability to obtain direct connections.

{¶ 86} Yet a number of factors affect whether FERC will approve a proposed direct connection or bypass facility. These factors include, among others, the environmental impact of the proposed project, whether landowners are inconvenienced, whether economically superior alternatives are available, the existence of other transmission and distribution facilities in the area, whether system access and reliability will be enhanced by the project, and whether proposed transportation rates resulted from unfair competition or discriminatory behavior. See generally *Midcoast Interstate Transm., Inc., v. Fed. Energy Regulatory Comm.* (C.A.D.C.2000), 198 F.3d 960; *Midwestern Gas Transm.*, FERC No. CP98–538–000, 1998 WL 878038.

{¶ 87} Undoubtedly, state taxes would play a role in any pipeline-construction project. However, Congress does not preempt "every state statute that has some indirect effect on rates and facilities" of interstate-pipeline companies. See *Schneidewind*, 485 U.S. at 308, 108 S.Ct. 1145, 99 L.Ed.2d 316. Here, Columbia has offered no credible evidence that Ohio's assessment rate on the property of

an interstate-pipeline company interferes with FERC's regulation of direct connections or in any way restricts such arrangements.

{¶ 88} Accordingly, Columbia's proposition of law No. 4 is overruled.

### Equal Protection

{¶ 89} Columbia contends in proposition of law No. 5 that assessing the personal property of interstate-pipeline companies at 88 percent while applying a 25 percent assessment rate to the property of Ohio LDCs and general businesses with which the interstate-pipeline companies compete violates the Equal Protection Clauses of the United States and Ohio Constitutions.

{¶ 90} "The limitations placed upon governmental action by the federal and state Equal Protection Clauses are essentially the same." *McCrone v. Bank One Corp.*, 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, ¶ 7. The Equal Protection Clauses require that all similarly situated individuals be treated in a similar manner. Id. at ¶ 6.

{¶ 91} A statutory classification that involves neither a suspect class nor a fundamental right does not violate the Equal Protection Clauses if it bears a rational relationship to a legitimate governmental interest. *Menefee v. Queen City Metro* (1990), 49 Ohio St.3d 27, 29, 550 N.E.2d 181. Under the rational-basis standard, a state has no obligation to produce evidence to sustain the rationality of a statutory classification. *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.* (1999), 87 Ohio St.3d 55, 58, 60, 717 N.E.2d 286. Rather, the assessment of taxes is fundamentally a legislative responsibility and a taxpayer challenging the constitutionality of a taxation statute bears the burden to negate every conceivable basis that might support the legislation. *Lyons v. Limbach* (1988), 40 Ohio St.3d 92, 94, 532 N.E.2d 106.

{¶ 92} Moreover, "[t]his already deferential standard 'is especially deferential' in the context of classifications arising out of complex taxation law." *Park Corp. v. Brook Park*, 102 Ohio St.3d 166, 2004-Ohio-2237, 807 N.E.2d 913, ¶ 23, quoting *Nordlinger v. Hahn* (1992), 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1. States have great leeway in making classifications and drawing lines that in their judgment produce reasonable systems of taxation. See *Nordlinger*, 505 U.S. at 11, 112 S.Ct. 2326, 120 L.Ed.2d 1.

{¶ 93} *Equal Protection—LDCs and Interstate–Pipeline Companies.* In *Gen. Motors Corp.*, the Supreme Court found that there was a rational basis for treating LDCs and independent marketers differently for tax purposes. 519 U.S. at 311–312, 117 S.Ct. 811, 136 L.Ed.2d 761. Accordingly, Columbia's claim that Ohio's tax scheme violates the Equal Protection Clauses by treating LDCs and interstate-pipeline companies differently is rejected.

{¶ 94} *Equal Protection—Interstate–Pipeline Companies and Alternative–Fuel Suppliers.* Columbia also claims that the Tax Commissioner denied it equal protection of the laws because he taxed the personal property of interstate-pipeline companies at a higher assessment rate than the personal property of Ohio taxpayers that transport "alternative fuels."[6] Columbia contends that natural gas and alternative fuels—including coal and refined petroleum products such as fuel oil and propane—are competing fuels, and that there is no rational basis for different assessment rates on interstate-pipeline companies and transporters of alternative fuels.

{¶ 95} However, "[t]he fact that one business competes with another does not, of itself, mean that the two companies are similarly situated for purposes of equal protection." *GTE N., Inc. v. Zaino*, 96 Ohio St.3d 9, 2002-Ohio-2984, 770 N.E.2d 65, ¶ 39. Thus, in determining whether R.C. 5727.111 deprives Columbia of the constitutional right of equal protection, we must first determine whether Columbia is similarly situated to Ohio taxpayers that transport alternative fuels. *GTE N.* at ¶ 23.

{¶ 96} First, the record before us contains insufficient evidence concerning the operations of those alternative-fuel suppliers with which Columbia claims to compete. Thus, because the record is not factually sufficient to make a valid comparison between the transportation and uses of alternative fuels and those services provided by interstate-pipeline companies, we may reject Columbia's claim on that ground alone. See *Lyons v. Limbach*, 40 Ohio St.3d at 94, 532 N.E.2d 106.

{¶ 97} Second, Columbia, an interstate-pipeline company, has not shown that it is similarly situated to Ohio businesses that transport alternative fuels. Columbia transports natural gas interstate solely by pipeline. In contrast, the transporters of alternative fuels use several different means to transport their products, including pipelines, tanker trucks, rail cars, and barges. Distinctive features also exist among the products being transported. For instance, industrial and electric-power plants are limited in the number of hours that they can burn certain alternative fuels, such as coal and fuel oil, because of the emissions those fuels produce when burned.

{¶ 98} Third, Columbia has not negated every conceivable basis that might support the legislation. Columbia offers little more than a blanket assertion that there is no identified or apparent rational basis for the differing assessments on the property of an interstate-pipeline company and the property of a transporter of alternative fuel. Our job is simply to determine, with great deference, whether

---

6. One Columbia witness defined alternative fuels as a substitute for natural gas that is used for heating or for power generation.

there is a rational basis for the General Assembly's taxation decisions. See *Park Corp. v. Brook Park,* 102 Ohio St.3d 166, 2004-Ohio-2237, 807 N.E.2d 913, ¶ 36. Each of the distinctions cited above could provide a rational basis for treating these businesses differently than interstate-pipeline companies. Any variations in the costs of transportation, fuels, labor, insurance, taxes, or regulatory obligations could provide a rational basis for assessing these companies at a lower rate.

{¶ 99} Columbia raises a similar claim that Ohio's tax scheme violates equal protection because the personal property of interstate-pipeline companies that provide natural gas gathering services in Ohio is taxed higher than the personal property of Ohio taxpayers that engage in natural gas gathering. However, between 1993 and 1998, Columbia sold all of its gathering facilities. Thus, Columbia is not within the class of taxpayers that it claims are the victims of the purportedly irrational classifications. Because Columbia is not a gatherer or producer of natural gas in Ohio, it lacks standing to attack the statute's constitutionality on the ground that it violates others' rights to equal protection. See *State ex rel. Harrell v. Streetsboro City School Dist. Bd. of Edn.* (1989), 46 Ohio St.3d 55, 63, 544 N.E.2d 924.

{¶ 100} Even if Columbia had standing to raise this particular equal-protection claim, Columbia has not met its burden of negating every conceivable basis that might support legislation treating these entities differently.

{¶ 101} Accordingly, Columbia's equal-protection claims lack merit, and we reject proposition of law No. 5.

Conclusion

{¶ 102} The BTA erred in finding that Columbia was a natural gas company under R.C. 5727.01(D)(4) for the purpose of taxing the personal property of a public utility. The BTA failed to consider R.C. 5727.02, which establishes a primary-business test for purposes of R.C. 5727.01. Because Columbia is primarily engaged in the interstate transportation of natural gas, the Tax Commissioner correctly found that Columbia was a pipeline company under R.C. 5727.01(D)(5) and properly assessed Columbia's personal property at the 88 percent pipeline-company rate in R.C. 5727.111(D).

{¶ 103} In addition, none of Columbia's constitutional challenges have merit. Accordingly, Columbia's cross-appeal is overruled.

Decision reversed.

MOYER, C.J., and LUNDBERG STRATTON, O'DONNELL, and LANZINGER, JJ., concur.

PFEIFER and O'CONNOR, JJ., concur in judgment only.

Jones Day, Maryann B. Gall, Phyllis J. Shambaugh, Todd Swatsler, and Kasey T. Ingram, for appellee and cross-appellant Columbia Gas Transmission Corporation.

Marc Dann, Attorney General, Barton A. Hubbard and Janyce C. Katz, Assistant Attorneys General, and Cheryl D. Pokorny, Deputy Attorney General, for appellant and cross-appellee, Tax Commissioner of Ohio.

Taft, Stettinius & Hollister, L.L.P., and Fred J. Livingstone, urging reversal for amicus curiae Ohio School Boards Association.

Thelen, Reid, Brown, Raysman & Steiner, L.L.P., and Andrea Wolfman, urging affirmance for amicus curiae Interstate Natural Gas Association of America.