[Cite as *In re Certificate of Need Application for Project "Livingston Villa," Cuyahoga Cty.*, 2017-Ohio-196.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: | : | |
| | | **No. 15AP-1146** |
| Certificate of Need Application for Project | : | (O.D.H. No. 9063-01-13A) |
| "Livingston Villa," Cuyahoga County, | | |
| | : | **(REGULAR CALENDAR)** |
| (Appellee). | | |
| | : | |

D E C I S I O N

Rendered on January 19, 2017

**On brief:** *Dinsmore & Shohl, LLP, Thomas W. Hess* and *Brendan T. O'Reilly*, for appellants. **Argued:** *Brendan T. O'Reilly.*

**On brief:** *Bricker & Eckler LLP*, and *James F. Flynn*, for appellee Livingston Real Estate Co., LLC. **Argued:** *James F. Flynn.*

**On brief:** *Michael DeWine*, Attorney General, and *James T. Wakley*, for appellee Ohio Department of Health. **Argued:** *James T. Wakley.*

APPEAL from the Ohio Department of Health

KLATT, J.

{¶ 1} Appellants, Rea-Ann Westlake Properties, LLC, Rea-Ann Westlake, Inc., Rea-Ann Suburban Properties, LLC, Rea-Ann Suburban, Inc., the Lutheran Home, and Concord Reserve Realty, LLC, appeal from an order of appellee, the Ohio Department of Health ("ODH"), granting the certificate of need ("CON") application of appellee, Livingston Real Estate Company, LLC, d/b/a Livingston Villa ("Livingston Villa"). Because the order is supported by reliable, probative, and substantial evidence and is in accordance with law, we affirm.

**I.      Facts and Procedural History**

{¶ 2}   On May 9, 2014, Livingston Villa filed an application with ODH for a CON. The application proposed the construction of a new 100-bed facility, to be located in Westlake, Ohio in Cuyahoga County. Livingston Villa projected that the total cost of the project would be $14,003,000.

{¶ 3}   Livingston Villa stated in the CON application that it would acquire the 100 long-term care beds for its facility from other facilities located in Cuyahoga County via purchase agreements. Specifically, Livingston Villa stated it would receive 21 beds from Lakewood Hospital; 5 beds from the Montefiore Home; 13 beds from Pleasantview Care Center; 47 beds from Hillside Plaza; and 14 beds from Franklin Plaza. Legacy Health Services, Inc. ("Legacy") manages Hillside Plaza and Franklin Plaza, and will also manage Livingston Villa.

{¶ 4}   The Livingston Villa facility will be located "less than one (1) mile of St. John Medical Center," and the facility will "provide high quality rehabilitative and skilled services to residents that need such services." (Livingston Villa CON at 31.) Livingston Villa noted in the CON application that the "population of elderly residents in the service area is expected to grow and the Applicant's facility will help provide a nursing home to care for this growing population." *Id.* "All of the resident rooms" in Livingston Villa will be "large private rooms with private bathrooms and showers in each room." *Id.*

{¶ 5}   On December 10, 2014, the director granted Livingston Villa's CON application. On January 9, 2015, appellants requested an administrative hearing on the matter.

{¶ 6}   The matter was referred to a hearing examiner, who conducted a three-day hearing on May 5, 6, and 7, 2015.  At the hearing, Benjamin Chukwumah, the ODH staff member who initially reviewed the CON application, testified that the "trend now is providing private rooms, with larger beds, larger room sizes, and for primarily comfort of the resident." (Tr. Vol. I at 79.) Eliav Sharvit, the general counsel for Legacy, noted that most nursing home residents prefer private rooms. Russell Corwin, a certified public accountant ("CPA") who specializes in accounting for nursing homes, testified that, when a patient is discharged from a hospital, "the physicians group would prefer to have them in that private room." (Tr. Vol. I at 147.)

{¶ 7}  John Griffiths, president of Rea-Ann Holdings, the management company for the Rea-Ann facilities, testified that his company wanted the director of ODH to withdraw his approval of the Livingston Villa CON. Griffiths asserted that Cuyahoga County was "the most over bedded county in the state, and [he did not] see a need for an addition[al] hundred bed home in our area." (Tr. Vol. I at 169.) Charles Rinne, the CEO of the Lutheran Home, testified that, based on "questionable shuffling of beds, both intra-county and inter-county, and the economic principles of supply and demand * * * and an overall census of approximately 80 percent in the primary and secondary markets, the C.O.N. should never have been granted." (Tr. Vol. II at 98.)

{¶ 8}  On September 21, 2015, the hearing examiner issued a report and recommendation, containing findings of fact and conclusions of law. The hearing examiner recommended that the director withdraw his approval of the Livingston Villa CON. The hearing examiner observed that Hillside Plaza was a 47-bed facility, and that the transfer of Hillside Plaza's 47 beds to Livingston Villa would effectively close Hillside Plaza.  The hearing examiner thus concluded that "[t]he approval and implementation of the certificate of need application for the Livingston Villa project would close Hillside Plaza as a long-term care facility, would eliminate any capacity by Hillside Plaza to carry out the reviewable activity described in its certificate of need application that was approved on March 19, 2013, and would result in a violation of Ohio Revised Code section 3702.53(C)." (Sept. 21, 2015 Report and Recommendation at 96.)

{¶ 9}  On October 5, 2015, Livingston Villa filed objections to the hearing examiner's report and recommendation.  Appellants filed objections to the report and recommendation on October 6, 2015.

{¶ 10} The director issued an order on November 24, 2015, rejecting and modifying the hearing examiner's recommendation. The director concluded that the Livingston Villa CON would not cause Hillside Plaza to act other than in substantial accordance with its CON. The director further observed that the Hillside Plaza CON was "separate from that of applicant, Livingston Villa." (Adjudication Order at 2.) Because the Livingston Villa CON "presented a reviewable activity as defined in R.C. 3702.511" and met the requirements for granting a CON, the director granted Livingston Villa's application for a CON.  *Id.*

## II.    Assignments of Error

{¶ 11} Appellants appeal, assigning the following errors for our review:

Assignment of Error I:

The Director's Order Approves Actions Specifically Prohibited by R.C. 3702.53(B), and is Therefore Not in Accordance with Law.

Assignment of Error II:

The Director's Order Relies Upon Incorrect Interpretations of R.C. 3702.52 and 3702.53, and is Therefore Not in Accordance with Law.
Assignment of Error III:

The Director Incorrectly Considered the Review Criteria Specified in the Ohio Administrative Code, and Therefore the Order is not Supported by Substantial, Probative, and Reliable Evidence, nor is it in Accordance with Law.

Assignment of Error IV:

This Court Erred in Denying the Motion for Judgment in Favor of the Appellants Based on the Ohio Department of Health's Failure to Timely Certify the Record of Proceedings.

## III.    First Assignment of Error – Franklin Plaza

{¶ 12} Appellants' first assignment of error asserts that, in granting the Livingston Villa CON, the director approved actions prohibited by R.C. 3702.53(B). Specifically, appellants contend that the Livingston Villa CON attempts to circumvent the CON rules regarding inter-county bed transfers.

{¶ 13} Pursuant to R.C. 3702.52(C)(1), if a project proposed in a CON application "meets all of the applicable certificate of need criteria for approval under sections 3702.51 to 3702.62 of the Revised Code * * *, the director shall grant a certificate of need for all or part of the project that is the subject of the application." A person affected by the director's ruling on a CON application "may appeal the director's ruling in the adjudication hearing to the tenth district court of appeals." R.C. 3702.60(A). This court's standard of review in considering an appeal from the director provides that "[t]he court shall affirm the director's order if it finds, upon consideration of the entire record and any

additional evidence admitted * * *, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law." R.C. 3702.60(F)(3). In the absence of such a finding, we must reverse, vacate, or modify the order. *Id.*

{¶ 14} Although " 'this court may engage in a very limited weighing of the evidence upon an appeal of this nature, we may not substitute our judgment for that of the Department as to the credibility of witnesses and the weight to be given the testimony.' " *Manor Care*, 10th Dist. No. 05AP-398, 2005-Ohio-5703, ¶ 9, quoting *In re Knolls of Oxford*, 10th Dist. No. 02AP-514, 2003-Ohio-89, ¶ 13. Rather, a reviewing court must give due deference to the administrative resolution of evidentiary conflicts. *Id.*, citing *In re Christian Care Home of Cincinnati, Inc.*, 74 Ohio App.3d 453 (10th Dist.1991), citing *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108 (1980). Analysis of whether the director's decision is supported by the evidence is essentially a question of the absence or presence of the requisite quantum of evidence. *Id.*

{¶ 15} R.C. 3702.592 governs applications for the "replacement or relocation of existing beds from an existing long-term care facility within the same county." Because all of the source facilities from which Livingston Villa will receive long-term care beds are located in Cuyahoga County, Livingston Villa properly filed its CON application pursuant to R.C. 3702.592. R.C. 3702.594 governs applications for an "increase in beds in an existing nursing home" when the proposed increase "is attributable solely to a relocation of licensed nursing home beds from an existing nursing home to another existing nursing home located in a county that is contiguous to the county from which the beds are to be relocated," and is for "[n]ot more than a total of thirty nursing home beds." Because Livingston Villa is not yet an existing nursing home, it could not have filed for an inter-county bed transfer under R.C. 3702.594.

{¶ 16} Appellants assert that the 14 long-term care beds Livingston Villa will receive from Franklin Plaza "are not, in fact, from Cuyahoga County." (Appellant's brief at 14.) Appellants assert that these 14 beds are Summit County beds that Livingston Villa passed through Franklin Plaza in order to circumvent the requirements of R.C. 3702.594. Appellants assert that, in doing so, Livingston Villa has violated R.C. 3702.53(B), which prohibits any person from separating "portions of any proposal for any reviewable activity to evade the requirements of sections 3702.51 to 3702.62 of the Revised Code." The CON

application asked Livingston Villa to identify, for each source facility, the current bed status of the facility and what the bed status of the facility would be after implementation of the Livingston Villa project. Regarding Franklin Plaza, Livingston Villa stated that Franklin Plaza has 201 long-term care beds, and that it would have 201 long-term care beds after the project was implemented. Livingston Villa explained this result by noting as follows:

> Please note that Franklin Plaza Extended Care Center has filed a CON with the Ohio Department of Health seeking approval to relocate 14 beds from a Summit County nursing home to Franklin Plaza to replace the 14 beds that are being relocated to the Applicant in this CON, so that after both CONs are approved and implemented, Franklin Plaza Extended Care Center will remain licensed and certified at 201 beds.

(Livingston Villa CON at 24.)

{¶ 17} Appellants assert that this statement demonstrates that Livingston Villa has violated R.C. 3702.53(B), as Livingston Villa could not have moved the Summit County beds directly into a new facility. Appellants contend that Livingston Villa "attempted to accomplish this result * * * by splitting the activity into separate applications for certificates of need that may each be *separately* permissible." (Emphasis sic.) (Appellant's brief at 17.)

{¶ 18} The director granted the Franklin Plaza CON application on December 2, 2014, thereby approving the transfer of the 14 long-term care beds from a Summit County facility into Franklin Plaza. Appellants did not appeal that order, and the instant appeal concerns only the Livingston Villa CON. As such, the propriety of the director's approval of the 14-bed transfer is not before us for review. As of December 2, 2014, the 14 long-term care beds at issue became Cuyahoga County beds existing at Franklin Plaza, and remained as such when the director granted Livingston Villa's CON application on December 10, 2014. *See* Ohio Adm.Code 3701-12-01(J) and (O)(5) (defining an existing bed as "[a] bed held as an approved bed under a certificate of need approved by the director").

{¶ 19} Appellants assert that "[a]ny disparity in the timing between the two" CONs "would result in either more Beds than physically possible at Franklin Plaza, or fewer

certified Beds than actually operational." (Appellant's brief at 20-21.) However, Mr. Sharvit explained that the Livingston Villa CON was "not contingent upon" the Franklin Plaza CON. (Tr. Vol. III at 109.) He observed that, if the director did not grant the Franklin Plaza CON, the total number of long-term care beds at Franklin Plaza "goes down to 187." *Id.* While appellants argue that it was not possible for Franklin Plaza to accept 14 beds, the Franklin Plaza CON is not before us for review. Accordingly, whether it was or was not possible for Franklin Plaza to accept the 14 long-term care beds is not presently at issue.

{¶ 20} Mr. Chukwumah explained that, "using the occupancy rates for" Franklin Plaza, "the number of beds that were going to be relocated or purchased by the applicant, those beds are no longer occupied, they are just sitting there." (Tr. Vol. at I 56.) Mr. Chukwumah noted in his report to the director that the "occupancy rate for Franklin Plaza in 2014 [was] 92.38 percent of 201 long-term care beds (201-185=16 beds). Sixteen beds are not currently occupied." (Livingston Villa CON at 336.) Thus, even in the absence of the director's approval of the Franklin Plaza CON, Franklin Plaza had more than 14 unoccupied beds available to sell to Livingston Villa.

{¶ 21} As noted by the hearing examiner, "beds intended to serve residents at long-term care facilities are fungible, that is, any actual bed may be substituted for any other actual bed and the result is considered the same." (Report and Recommendation at 82.) Accordingly, it is impossible to say whether the 14 long-term care beds being relocated from Franklin Plaza to Livingston Villa were any of the 201 beds existing at Franklin Plaza before December 2, 2014, or whether they were the newly acquired beds existing at Franklin Plaza after December 2, 2014.

{¶ 22} Livingston Villa was also transparent with the director about these transfers. Mr. Sharvit explained that Livingston Villa included the note regarding the pending Franklin Plaza CON in the Livingston Villa CON application "in the interest of full disclosure and forthrightness to say what's actually happening." (Tr. Vol. III at 109.) Franklin Plaza complied with the CON laws regarding the inter-county movement of long-term care beds, and Livingston Villa complied with the CON laws regarding the intra-county movement of beds. Livingston Villa's compliance with the applicable CON laws, and disclosure of the pending Franklin Plaza transfer to the director, demonstrate that

Livingston Villa did not separate portions of a proposal in an attempt to evade the CON statutes.

{¶ 23} Appellants have failed to demonstrate that Livingston Villa violated R.C. 3702.53(B). Based on the foregoing, appellants' first assignment of error is overruled.

## IV.   Second Assignment of Error – Hillside Plaza

{¶ 24} Appellants' second assignment of error asserts that the director erred in his interpretation of R.C. 3702.52(E) and 3702.53(C).  Appellants' contentions in this assignment of error relate to the 47 long-term care beds which the Livingston Villa CON will transfer from Hillside Plaza to Livingston Villa.

{¶ 25} Question 10.38 of the CON application asked Livingston Villa, if it was proposing the replacement of a facility, to "attach as Exhibit M a detailed study of the respective costs that demonstrates that replacement of the source facility is more cost-effective or otherwise more feasible than its renovation." (Livingston Villa CON at 69.) Livingston Villa responded to the question by noting that it would receive 47 beds from Hillside Plaza, which was "expected to be closed in the next several months. This project will, in part, replace Hillside Plaza and attached hereto as **Exhibit M** is a detailed study of costs as requested." (Emphasis sic.) *Id.*

{¶ 26} In Exhibit M, Livingston Villa explained that Hillside Plaza was constructed in the early 1960s, and that "[w]ithout having experienced any substantial structural or mechanical renovations, the facility's systems, windows, roof, kitchen equipment, HVAC and other features of the building are approaching the end of their useful life." *Id.* at 223. Livingston Villa noted that Hillside Plaza's "current lack of size prevents it from doing laundry services at the facility," and that due to the material used to construct the building, any "structural modification would be cost prohibitive." *Id.* Livingston Villa further observed that, at a bed capacity of 47, Hillside Plaza's "operational economies of scale are less efficient than nursing homes with larger capacity." *Id.* *Compare* Ohio Adm.Code 3701-12-23(J).  Livingston Villa also noted that "Hillside Plaza's design and layout reflects a market period that placed less value on the residential dignity of each resident and their family and pursued the delivery of long term care services with a much more institutional flavor." *Id.*

{¶ 27} Hillside Plaza's utilization rates were 85.31 percent in 2012, 79.32 percent in 2013, and 74.52 percent in 2014. (Livingston Villa CON at 146.) Livingston Villa noted that it did not anticipate that any Hillside Plaza residents would "be residing in the beds to be relocated," because Hillside Plaza would be closed "in the next several months as its occupancy has been declining and the cost to maintain the premises is prohibitive." *Id.* at 68. Livingston Villa stated that it would coordinate the transfer of any Hillside Plaza resident "with the applicable Ombudsman, resident and family." *Id.* at 69.

{¶ 28} The Hillside Plaza CON application, filed on November 2, 2012, asked the director to approve the transfer of 23 long-term care beds from a facility in Lake County into Hillside Plaza. The director granted Hillside Plaza's CON on March 19, 2013. The Livingston Villa CON application was filed on May 9, 2014.

{¶ 29} Mr. Sharvit explained that, between the filing of the two CON applications, Hillside Plaza's financial situation and outlook changed. He noted that, before filing the Hillside Plaza CON application, Legacy paid off Hillside Plaza's "mortgage so as to not breach financial covenants as a result of decreasing census in the building," and that Hillside Plaza "turned solvent." (Tr. Vol. III at 115.) Legacy then had to "re-inject equity capital to sustain [Hillside Plaza], and in so doing you have a leap, a substantial leap to positive cash flow." *Id.* at 114-15. Thereafter, however, the "cost of operating the facility" became too great. *Id.* at 114. Thus, while Legacy had "replenished the beds to continue operating [Hillside Plaza] after paying off the mortgage," Legacy subsequently determined that "in the long run it [did not] make sense to continue operating this, and the most useful way to allocate the resources available from the facility, mainly beds, because the physical plant is obsolete, [was] to build a new facility inside of the county and to relocate those beds." *Id.* at 116-17.

{¶ 30} R.C. 3702.53(C) provides that "[n]o person granted a certificate of need shall carry out the reviewable activity authorized by the certificate of need other than in substantial accordance with the approved application for the certificate of need." *Compare In re MSI Regency Village, Ltd.*, 10th Dist. No. 08AP-64, 2008-Ohio-3830, ¶ 24 (finding that MSI violated R.C. 3702.53(C), because "the relocation of residents was a reviewable activity," and "MSI failed to conduct this activity in substantial accordance

with the plan of care they had set forth in the CON application"). R.C. 3702.52(E) provides as follows:

> During the period beginning with the granting of a certificate of need and ending five years after implementation of the reviewable activity for which the certificate was granted, the director shall monitor the activities of the person granted the certificate to determine whether the reviewable activity is conducted in substantial accordance with the certificate. A reviewable activity shall not be determined to be not in substantial accordance with the certificate of need solely because of a decrease in bed capacity.

{¶ 31} The hearing examiner stated that he could not "accept that a long-term care facility offering no long-term care beds can provide the reviewable activity described in the certificate of need application approved for Hillside Plaza on March 19, 2013." (Report and Recommendation at 87.) The hearing examiner noted R.C. 3702.52(E), but stated that his decision was not based "on the bed decrease but on whether Hillside Plaza" would be able to carry out the reviewable activity covered by its CON. *Id.* The hearing examiner concluded that the Livingston Villa CON resulted in a violation of R.C. 3702.53(C), because it would "make it impossible for Hillside Plaza to fulfill its obligations under its certificate of need." *Id.* at 92.

{¶ 32} The director determined that the hearing examiner had "based his finding on the conclusion that decreasing bed capacity at Hillside Plaza would cause it to be out of substantial accordance with the CON it was granted." (Adjudication Order at 2.) Relying on R.C. 3702.52(E), the director concluded that the decrease in bed capacity was not an indication that Hillside Plaza had carried out a reviewable activity other than in substantial accordance with its CON. The director further observed that the Hillside Plaza CON was separate from the Livingston Villa CON, and that "[b]oth applications were reviewed when received for the project described. The Hillside Plaza CON was not the subject of the hearing and the Livingston Villa CON was at issue. The Hearing Examiner did not find any deficiency with Livingston Villa's application." *Id.*

{¶ 33} The director also stated that, "because Livingston Villa has not yet been granted a CON, R.C. 3702.53(C) does not apply to it." *Id.* Appellants assert that this statement "makes no sense," because "Livingston Villa was granted a certificate of need on December 10, 2014." (Appellants' brief at 23-24.) We agree that Livingston Villa was

granted a CON on December 10, 2014, but find no reversible error in the director's misstatement.

{¶ 34} Due to the proceedings below and in this appeal, Livingston Villa has not begun to carry out any of the reviewable activities in its CON. Accordingly, R.C. 3702.53(C) cannot yet apply to Livingston Villa, as Livingston Villa has not had the opportunity to carry out a reviewable activity. Thus, Livingston Villa cannot yet have carried out a reviewable activity "other than in substantial accordance with the approved application for the certificate of need." R.C. 3702.53(C). *Compare* R.C. 3702.532 (noting that, when the director determines that a person has violated R.C. 3702.53(C), "the director shall send a notice to the person * * * specifying the activity constituting the violation"); R.C. 3702.55 (providing for additional penalties if a person who has violated R.C. 3702.53(C) "fails to cease conducting an activity").

{¶ 35} Appellants assert that, while Livingston Villa "may not be the legal entity violating the law," because "Legacy controls both Hillside Plaza and Livingston Villa," it is "appropriate to hold Legacy accountable for the actions and violations of both entities." (Appellant's brief at 24.) However, Legacy is not party to this action, and the Hillside Plaza CON is not before this court for review. Again, the present appeal concerns only the Livingston Villa CON.

{¶ 36} The director also concluded that, pursuant to R.C. 3702.52(E), a decrease in bed capacity, including a total decrease in bed capacity, does not render an entity out of substantial accordance with its CON. Notably, while the "construction of a new long-term care facility," the "[r]enovation of or addition to a long-term care facility," and "[a]n increase in long-term care bed capacity" are all reviewable activities under R.C. 3702.511, the closure of a long-term care facility is not listed as a reviewable activity.

{¶ 37} Appellants assert that R.C. 3702.52(E) is inapplicable in this action because "the offending conduct in question is not 'solely' a decrease in bed capacity." (Appellant's brief at 25.) Appellants assert that R.C. 3702.52(E) does not pertain to "more drastic decrease[s] in bed capacity," and they state that a drastic decrease in bed capacity means "a decrease in capacity *and an additional negative factor* that may independently justify a determination that the reviewable activity has not been carried out in substantial accordance with the certificate of need." (Emphasis sic.) (Appellant's brief at 26-27.)

Appellants assert that "the additional negative factor" here is the "complete closure" of Hillside Plaza. (Appellant's brief at 27.)

{¶ 38} Appellants "additional negative factor" argument essentially attempts to add language to R.C. 3702.52(E). When interpreting a statute, "[c]ourts may not delete words used or insert words not used." *Columbia Gas Transm. Corp. v. Levin*, 117 Ohio St.3d 122, 2008-Ohio-511, ¶ 19. If a statute's meaning is clear, unequivocal, and definite, then statutory interpretation ends, and the court applies the statute according to its terms. *Id.*; *Hubbell v. Xenia*, 115 Ohio St.3d 77, 2007-Ohio-4839, ¶ 11.

{¶ 39} Furthermore, when interpreting an agency's statute or rule, a reviewing court " 'must give due deference to an administrative interpretation formulated by an agency which has accumulated substantial expertise, and to which the legislature has delegated the responsibility of implementing the legislative command.' " *In re 138 Mazal Health Care,* 117 Ohio App.3d 679, 685 (10th Dist.1997), quoting *State ex rel. McLean v. Indus. Comm.*, 25 Ohio St.3d 90, 92 (1986). A reviewing court need not find the agency's construction of a rule is the only reasonable one or even that it is the result the court would have reached. *Id. See also Manor Care* at ¶ 46 (noting that "[b]ecause the director's conclusion is not at odds with the statute itself, Manor Care properly could exclude said costs from its total project costs").

{¶ 40} Here, the director's construction of R.C. 3702.52(E) was reasonable and not at odds with the language of the statute. As such, we defer to the director's interpretation of the statute and find that any decrease in bed capacity, including a total decrease in bed capacity, "shall not be determined to be not in substantial accordance with the certificate of need." R.C. 3702.52(E). Accordingly, Hillside Plaza's decrease in bed capacity due to the Livingston Villa CON does not indicate that a reviewable activity was being conducted other than in substantial accordance with the CON.

{¶ 41} Appellants lastly assert that, as Exhibit M is essentially a "one-paragraph long narrative," Livingston Villa failed to attach a detailed study regarding the cost-effectiveness of renovating Hillside Plaza. (Appellant's brief at 30.) *See* Ohio Adm.Code 3701-12-23.2(D) (stating that, to replace a facility and relocate beds, the applicant must provide a "detailed study" demonstrating "that replacement of the facility is more cost-effective or otherwise more feasible for the applicant than renovation"). However, this

court has held that where there is sufficient testimony explaining why renovation of the facility to be replaced is not feasible, the fact that a CON applicant "did not provide a 'detailed study' of potential costs is not determinative." *Manor Care* at ¶ 25. In *Manor Care*, a Manor Care representative explained that the facility to be replaced "required new plumbing, a new heating plant, and other new infrastructure," such that Manor Care had "determined renovations were not feasible." *Id.*

{¶ 42} Mr. Sharvit explained at the hearing that "replacement of the [Hillside Plaza] facility was not an option given the size of the land and given the quality of the building." (Tr. Vol. III at 128.) He also noted that the statements in Exhibit M were a summary of the internal analysis Legacy conducted every day regarding the operation and viability of Hillside Plaza. Livingston Villa's statements in Exhibit M, combined with Mr. Sharvit's testimony at the hearing, provided reliable, probative, and substantial evidence to support the director's finding that Livingston Villa sufficiently demonstrated that replacing Hillside Plaza was more cost-effective than renovating the facility.

{¶ 43} Based on the foregoing, appellants' second assignment of error is overruled.

## V.    Third Assignment of Error – Reliable, Probative, and Substantial Evidence

{¶ 44} In their third assignment of error, appellants assert that the director's order is not supported by reliable, probative, and substantial evidence and is not in accordance with Ohio Adm.Code 3701-12-20(E) or (J). Ohio Adm.Code 3701-12-20 provides criteria which the director must apply "when reviewing an application for a certificate of need." Ohio Adm.Code 3701-12-20(A). Ohio Adm.Code 3701-12-20(E) obligates the director to consider "the impact of the project on all other providers of similar services in the service area specified by the applicant including the impact on their utilization, market share and financial status." Ohio Adm.Code 3701-12-20(J) obligates the director to "consider the impact of the project on existing staffing levels, if applicable, and the availability of personnel resources to meet the applicant's projected requirements."

{¶ 45} "Reliable" evidence is evidence that is dependable and may be confidently trusted. *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571 (1992). In order to be reliable, there must be a reasonable probability that the evidence is true. *Id.* "Probative" evidence is evidence that tends to prove the issue in question; it must be

relevant in determining the issue. *Id.* "Substantial" evidence is evidence with some weight; it must have importance and value. *Id.*

{¶ 46} The hearing examiner acknowledged that increased "competition is unavoidable and inherent in the construction and operation of a new facility." (Report and Recommendation at 80.) The hearing examiner concluded that the competition expected from the Livingston Villa project "as to utilization, market share, and financial status of the existing service providers operating in the service area proposed to be served by Livingston Villa is not found * * * to support a recommendation of the withdrawal of the Livingston Villa certificate of need application's approval." *Id.* at 90.

{¶ 47} This court has acknowledged that "[a]ny new facility will initially impact existing providers to some extent[, and] [i]f some impact was sufficient to deny a CON, then few, if any, * * * would ever be approved." *Manor Care* at ¶ 51. *See also In re Green Village Skilled Nursing Ctr.*, 10th Dist. No. 12AP-91, 2012-Ohio-3769, ¶ 38; *In re Altercare of Stow Rehab. Ctr.*, 10th Dist. No. 12AP-29, 2012-Ohio-4243, ¶ 22 (noting that this "court has recognized that some negative impact does not necessarily require denial of a CON application").

{¶ 48} Appellants contend that "the proposed project would have more than a typical competitor's negative impact on the utilization, market share, and financial status of surrounding nursing homes." (Appellant's brief at 36.) Appellants, however, fail to support their contention that Livingston Villa will have a "much greater impact than typical competition." *Id.* at 38.

{¶ 49} Appellants assert that Livingston Villa will dilute the Medicare payer pool, thereby harming other providers in the service area. Testimony at the hearing established that, between Medicare, Medicaid, and private insurance, Medicare pays providers the most for services rendered. (*See* Tr. Vol. I at 151.) Livingston Villa projected that its percentages of Medicare occupants would be 32.99 percent in the first year, 22.38 percent in the second year, and 21.98 percent in its third year of operation. (Livingston Villa CON at 141.) Corwin concluded that, based on Livingston Villa's usage projections, the "Medicare population for these three nursing homes should decline." (Tr. Vol. I at 115.)

{¶ 50} Appellants assert that Livingston Villa's Medicare utilization rates are "much higher than typical nursing homes in the area." (Appellant's brief at 38.) The

average Medicare utilization rates for all providers in the service area were 12.74 percent in 2012, 11.71 percent in 2013, and 11.55 percent in 2014. (Objector's Ex. at 12.) However, these figures are averages. Exhibit 12 demonstrates that the Avon Oaks nursing home and the Main Street Care Center, both located in the proposed service area, had Medicare utilization rates of 18.36 percent and 19.23 percent, respectively, in 2014. (Objector's Ex. at 12.) Rinne testified that the Lutheran Home had a Medicare utilization rate of 17 percent in 2014. (Tr. Vol. II at 74.) One of Livingston Villa's source facilities, Lakewood Hospital, has a Medicare only area in its facility, and it had a Medicare utilization rate of 84.5 percent in 2014.

{¶ 51} Livingston Villa explained in the CON application that it would have "[o]ne 50 bed area [that] will be utilized primarily for skilled care." (Livingston Villa CON at 31.) Skilled care refers to patients "that are not going to be in the institutional portion of the nursing home, and that skilled care will be for Medicare, and for insurance pays, for short stays." (Tr. Vol. I at 106.)  Mr. Sharvit explained that Livingston Villa intended to provide "high volume skilled services."  (Tr. Vol. III at 23.)  Thus, as Livingston Villa intends to serve more skilled care patients, it will likely have higher Medicare utilization rates than a facility that does not serve such patients.

{¶ 52} Accordingly, while Livingston Villa's projected Medicare utilization percentages may be above average for the service area, they are not outside of the reasonable range of utilization rates for providers in the service area. *See Manor Care* at ¶ 37 (noting that "[r]easonable projections are based on operational histories of similar facilities within the service areas and 'may vary widely among parties yet remain within the reasonable range' "). Mr. Rinne testified that, while Livingston Villa's utilization percentages might have been "extremely optimistic," he did not find them unreasonable. (Tr. Vol. II at 76.)  Accordingly, the evidence demonstrates Livingston Villa's projected Medicare utilization rates were within a reasonable range.

{¶ 53} Mr. Griffiths opined that Livingston Villa would "take market share from all of [Rea-Ann's] facilities," and that Livingston Villa's proximity to St. John Medical Center would "have an impact on [their] admissions." (Tr. Vol. I at 189, 170.) However, Mr. Griffiths acknowledged that "a number of facilities [have] come on-line since we started in business in 1974. I think I counted five in the primary and secondary service areas that

have come on-line, and 20 assisted living." (Tr. Vol. II at 12.) He admitted that "[s]o far," the Rea-Ann facilities had successfully overcome competitive pressures from new facilities entering the service area. *Id.* at 13. *Compare In re Ave. at Aurora*, 10th Dist. No. 12AP-151, 2013-Ohio-1145, ¶ 22.

{¶ 54} Mr. Rinne noted that, although "every time [they] lose an admission it harms [them]," he also admitted that Livingston Villa wasn't going to "bankrupt" the Lutheran Home. (Tr. Vol. II at 88.) Mr. Rinne stated, "whether you come or don't come * * *, is that going to make the difference, I don't think so." *Id.* at 97.

{¶ 55} Accordingly, appellants failed to demonstrate that Livingston Villa will cause anything more than a typical impact on the utilization, market share, and financial status of the existing providers in the service area. There was reliable, probative, and substantial evidence in the record demonstrating that Livingston Villa will have some impact, but not such a severe impact on other area providers as to warrant denial of the Livingston Villa CON. *See In re Green Village Skilled Nursing Ctr.* at ¶ 37 (noting that "[p]resented with conflicting testimony as to the impact on other providers in the service area, including appellant, the hearing examiner gave weight to the testimony that appellant will be able to successfully withstand the opening of a new facility").

{¶ 56} Appellants next assert that the director erred by failing to deny the Livingston Villa CON due to the effect the project will have on staffing at appellants' facilities. Livingston Villa noted in the CON application that, "[g]iven the current job market and unemployment rate, the Applicant does not believe that its recruitment of staff will affect other area health care providers, assuming that those providers provide quality care, [and] offer competitive pay and benefits to employees." (Livingston Villa CON at 58.)

{¶ 57} "[N]ursing homes everywhere are faced with the challenge of finding and retaining quality staff. If tight staffing were sufficient to deny a CON application, they apparently all would be denied." *Manor Care* at ¶ 54. The hearing examiner noted that "[s]ecuring adequate staff to operate long-term care facilities in the service area * * * has been a long-standing and continuing challenge," and concluded that he did "not find the competition expected from an approved and implemented Livingston Villa project for

adequate staffing to be sufficiently onerous to recommend" denial of the CON. (Report and Recommendation at 90.)

{¶ 58} Appellants assert that the Livingston Villa CON "proposes a more significant negative impact than typical competitors. Specifically, the unique difficulties of the proposed service area must be considered." (Appellant's brief at 41.) Appellants state that the unique difficulties in the proposed service area are that housing costs in the service area are high so that "individuals willing to work for nursing home staff wages typically do not live locally," and that "public transportation into the proposed service area is minimal, further limiting the potential pool of employees." *Id.* at 42.

{¶ 59} Griffiths testified that Livingston Villa would have a "negative impact" on staffing at Rea-Ann's facilities, because there is a "limited number of people, many of whom * * * can't afford the housing in that area." (Tr. Vol. I. at 188.) However, the evidence also demonstrated that at least one of Rea-Ann's facilities is located on a bus line and does "have limited bus service." (Tr. Vol. II at 49.) Griffiths admitted that staffing was "a consistent pressure," and observed that, more so than fighting staff from leaving to go "make ten cents more an hour, * * * what [he's] finding now is we're fighting people wanting to go on government assistance." (Tr. Vol. II at 53.)

{¶ 60} Griffiths also noted that "every time that a new facility comes on-line it's a new shiny penny and everyone runs over there, and then they stay there for a while and they usually come back" in "about a year or so." *Id.* at 54. Rinne also stated that what he had "found in the past at a pretty high level is maybe 30 or 40 percent of our people who leave come back to us within a couple of months, because its not greener on the other side." (Tr. Vol. II at 93.) Rinne noted that the "bottom line on staffing, it's a constant battle whether you all come or don't come, okay." *Id.* Rinne admitted that Livingston Villa was "not going to effect [his] staffing levels" at the Lutheran Home. *Id.* at 95.

{¶ 61} Furthermore, Griffiths testified that Rea-Ann was one of the only facilities in Westlake to offer an ODH certified training program to "train people * * * and help them take the State Tested Nursing Assistant exam." (Tr. Vol. I at 182.) He admitted that the training program gave Rea-Ann a "competitive advantage" over other facilities. (Tr. Vol. II at 50.) Mr. Rinne explained that the Lutheran Home had partnered with Lorain

Community College to help train their nursing students, noting that partnering with a college "really does help." *Id.* at 92. *See Manor Care* at ¶ 53-54.

{¶ 62} Accordingly, the evidence demonstrated that staffing is a constant issue at appellants' facilities, that appellants have some competitive advantages over Livingston Villa with respect to staffing, and that staff who might leave appellants' facilities initially will likely return after a couple of months to a year. The hearing examiner heard the conflicting evidence regarding the impact Livingston Villa will have on area staffing levels, and concluded that the impact would not be sufficiently onerous as to warrant denial of the CON application. This court defers to the agency's resolution of evidentiary conflicts. *In re Green Village Skilled Nursing Ctr.* at ¶ 24 (noting that "a reviewing court must afford due deference to the administrative resolution of evidentiary conflicts"). Accordingly, we find that reliable, probative, and substantial evidence supports the director's conclusion that Livingston Villa would not cause such an onerous impact on staffing at appellants' facilities as to warrant denial of the application.

{¶ 63} Upon review, we find that the director properly considered the impact Livingston Villa would have on the surrounding facilities and on area staffing, and that the record contains reliable, probative, and substantial evidence to support the director's determinations as to those issues. Based on the foregoing, appellants' third assignment of error is overruled.

## VI.    Fourth Assignment of Error – Record

{¶ 64} Appellants' fourth assignment of error asserts that this court erred in denying appellants' motion for an order granting judgment in their favor. Appellants filed a motion on January 26, 2016, asserting that they were entitled to judgment in their favor because ODH failed to timely certify the record of proceedings to this court. In our February 3, 2016 journal entry denying the motion, we observed that appellants had filed their notice of appeal on December 22, 2015, and that ODH certified the record to the clerk of court on January 13, 2016. The clerk, however, did not docket the record until January 28, 2016. We noted that the "dispositive date is the date of certification by the agency, not the date of docketing by the clerk. The agency has complied with the 30-day requirement for certifying the administrative record under R.C. 119.12(I)." (Jan. 28, 2016 Journal Entry.)

{¶ 65} In their brief, appellants argue only that, "[f]or the reasons previously articulated in the Motion for Judgment filed by Appellants on January 26, 2016, the Appellants assert that ODH failed to timely certify the record to this court, and that judgment in favor of Appellants is therefore required." (Appellant's brief at 46.) Accordingly, for the reasons stated in our February 3, 2016 journal entry, we find that ODH timely certified the administrative record to this court. Appellants' fourth assignment of error is overruled.

## VII.   Conclusion

{¶ 66} Having overruled appellants' first, second, third, and fourth assignments of error, we affirm the order of the Ohio Department of Health.

*Order affirmed.*

BROWN, J., concurs.
BRUNNER, J., concurs in part and dissents in part.
_____